[ PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT
_____

No. 14-14068
_____

D.C. Docket No. 8:12-cv-01640-JSM-TBM


VISTA MARKETING, LLC,

                                    Plaintiff - Appellant Cross-Appellee,

versus

TERRI A. BURKETT,

                                    Defendant – Appellee Cross-Appellant.

_____

Appeal from the United States District Court
for the Middle District of Florida
_____

(February 4, 2016)

Before ROSENBAUM and FAY, Circuit Judges, and MIDDLEBROOKS,[*]
District Judge.

ROSENBAUM, Circuit Judge:

_____

[*] Honorable Donald M. Middlebrooks, United States District Judge for the Southern District of Florida, sitting by designation.

The Founders of our country had great faith in the jury system. *See* U.S. Const. amend. VII. So did the Congress that enacted the Stored Communications Act, 18 U.S.C. §§ 2701-2712 (the "SCA" or "Act"), choosing to leave the award of damages under the Act's civil provisions almost entirely to the jury.

In this SCA case, the jury concluded that Defendant-Appellee-Cross-Appellant Terri Burkett violated the Act when, in accordance with her lawyer's advice, she viewed her ex-husband Plaintiff-Appellant-Cross-Appellee Franklin Burkett's emails in an effort to prove to the divorce court that Franklin[1] was lying about and hiding assets. But, under the circumstances, the jury decided not to award Franklin any damages at all—neither actual nor punitive damages.

Dissatisfied with the jury's verdict, Franklin appealed to the district judge to award him hundreds of thousands of dollars in statutory damages. The district judge declined, awarded a more modest amount, and refused to award Franklin attorney's fees.

Now Franklin asks us to give him punitive damages, increase his award of statutory damages to at least $450,000, and award him attorney's fees. But the jury and Congress have spoken. And we have no authority to award actual or punitive damages when the jury has rejected the entry of such an award. Nor, under the SCA, do we (or the district court) have authority to award statutory damages in the

---

[1] To avoid confusion and for ease of reference, this opinion refers to the Burketts by their first names.

2

absence of actual damages.  For these reasons, we affirm the determination of the district court not to award punitive damages, and we vacate the district court's judgment to the extent that the court awarded statutory damages in the absence of actual damages.  Finally, we find no abuse of discretion in the district court's denial of attorney's fees, so we affirm that ruling.

## I.

## A.

Franklin and Terri Burkett were married on January 21, 1995.  The Burketts had their share of turmoil during their marriage, although they were able to stay together for as long as they did with the assistance of counseling.  According to Terri, as part of the counseling, the Burketts' counselor recommended that the couple share everything, including passwords to email accounts in an effort to make their marriage an "open book."  So Franklin gave Terri his password to his Vista web mail account and authorized her to access it.

Time passed, and a few years later, after discovering that Franklin allegedly had an extramarital affair, Terri filed for divorce on February 17, 2010.  The divorce proceedings were extremely contentious, lasting over three years, with great animosity between the Burketts.  As Franklin explained in his own words, "I will stay the course, fight for every penny I can get at all costs . . . ."  Franklin threatened to leave his wife "penniless" even though the couple had three children

3

together,[2] including one with special needs.  He also promised to "accuse [Terri] of doing all kinds of stuff and [to do] anything [Franklin could] do to make [Terri] uncomfortable."

**B.**

During the divorce proceedings, the valuation of Vista became a primary issue.  Previously, in 2007, the Burketts had established Vista, a telemarketing company.  Franklin was the managing member of Vista.  As for Terri, while she described herself as an owner of Vista, she was not a managing member, director, or employee of the company.  Nevertheless, Terri assisted in the formation of Vista by helping to find a location for the business, contributing to furnishing the office space, and writing scripts for the telemarketers to use during business calls.

In late September of 2011, Franklin filed a financial affidavit in which he asserted that Vista was likely going to close due to a continued downturn in its sales and losses and invoked this alleged circumstance as a reason to reduce his support obligations.  In response, the divorce court held a hearing on October 4, 2011, during which Franklin testified that Vista had closed.  This testimony came as a complete surprise to Terri and her divorce attorney, Joseph Park, because they both claimed to know of Vista's ongoing business success.

---

[2] Terri has a child from a prior relationship, so the Burketts had four children total.

4

Terri suspected that her estranged husband was lying about the financial status of Vista and sought to obtain information to prove that Vista was a thriving business. She recalled the Vista web mail account and decided to begin accessing her husband's Vista email account, frank@vistamktg.net. According to Terri, she had had the password since 2007, when the business first opened, and had accessed the email previously during their marriage.

Terri began regularly accessing the Vista web mail account to read her husband's emails from October 2011 until May 2012. As Terri explained her practice in reviewing the emails, she "may have" looked at emails before Franklin opened them, "but most of the time" she did not read them until after he had opened them first.

After viewing the emails, Terri concluded that Franklin had been lying about Vista's financial health. As Terri described the emails, they showed that Franklin had signed new contracts, and they evidenced discussions between Franklin and his brother about switching salaries, taking business offshore, and opening new offices.

Terri informed her divorce attorney, Park, that she had been accessing her husband's work emails through Franklin's email password. When Park asked Terri for how long she had had access to the emails, Terri responded, "Since 2007." After a discussion, Park advised Terri that she could legally continue to

access the email account as long as she did not read any communications between Franklin and his divorce attorney. Park also instructed Terri to print all relevant emails and place them in a notebook organized by subject and date.

Terri followed Park's instructions and later gave the emails to Park, who then provided them to an expert to value the marital assets, including assessing the financial health of Vista. Contrary to Franklin's contentions that Vista was virtually worthless, Terri's expert in the divorce proceedings valued the business at approximately $3 million, after reviewing the emails and other materials.

During Terri's May 8, 2012, deposition, Park provided Franklin's counsel with a binder containing copies of all of the Vista emails that Franklin had accessed.

Following the production of the emails, Franklin's divorce lawyer sought for Terri to produce the computer on which she had accessed Franklin's emails. Terri was unable to produce the hard drive since her stepfather Robert Fischer had disposed of it. She had asked her stepfather to take her personal computer to a computer business to have it "cleaned" on the day of her May 10, 2012, deposition. *Id.* Fischer took the computer to Safety Harbor Computers to obtain a new hard drive, and he disposed of the old hard drive by throwing it out in a dumpster. No backup copy existed. *Id.* Terri stated that she neither instructed nor intended for her stepfather to dispose of the old hard drive. Rather, she sought to "clean" the

computer of certain materials that her husband had placed on it so that her children would be able to use the computer.  She further indicated that she thought that the old hard drive had been "backed up."

## C.

On June 28, 2013, the divorce court entered a final judgment of dissolution of marriage.  In its judgment, the divorce court found that both Burketts owned Vista.  The divorce court valued the business at $2,850,000, and, in its distribution of the marital assets, it awarded the couple's 75% interest in Vista to Franklin.

Elsewhere in the Judgment, the divorce court noted that it had examined the emails and text messages.  Based on its review and the evidence adduced at trial, the divorce court concluded that Franklin had "[l]ied and misled the [divorce court] by testifying that [Vista] had 'closed' even though there was evidence that it continued to operate" and that Franklin had "swor[n] that his income had significantly decreased when in fact there was written evidence that his income remained the same throughout the applicable time period."  The divorce court further found that during the time when he claimed Vista would be closing and his income was diminishing, Franklin was actually shopping for homes valued between $800,000 and $975,000; traveling extensively, including to Monaco and the French Riviera; and seeking to buy an engagement ring valued at more than $100,000 for his girlfriend.  In addition, the divorce court determined that Franklin

had "[m]anipulated witness testimony during his brother, Tom Burkett's, deposition by text messaging him the desired answers from another room" and had engaged in other deceitful behavior during the course of the divorce proceedings. Finally, the divorce court found that Franklin had "[c]onspired to secrete and dissipate assets by moving them to offshore accounts."[3]

Franklin appealed the Judgment of the divorce court, and Florida's Second District Court of Appeal later affirmed.

## D.

About a month after the divorce court entered its final judgment, on July 23, 2012, Vista sued Terri, alleging that she violated the Stored Communications Act, 18 U.S.C. §§ 2701-2712, when she accessed Vista's web mail account and Franklin's Vista email account during the divorce proceedings.[4]

The case proceeded to a three-day jury trial. Prior to trial, however, Terri filed a motion *in limine* seeking to prevent Vista from introducing at trial testimony

---

[3] During the divorce proceedings, Franklin argued that he fabricated an email that he sent referring to these plans, in an effort to determine whether Terri was reading the email account. The divorce court concluded, however, that "[t]he fabricated email story was refuted at trial by [Franklin's] own testimony that he had no idea [Terri] had access to the email account until two days after the 'fabricated' email had been posted." The divorce court further cited the following email as evidence that Franklin was using his brother's business, Burkett Asset Management ("BAM"), to mislead the divorce court about his income: "We need to discuss how we want to set up the new programs, hire vista as a labor shop to cover expenses where BAM get the management fee . . . [.] It is just [a] better way cuz vista has exposure and want to keep other stuff clean . . . [.] Plus . . . [Terri] can't do a damn thing about it." [sic].

[4] Initially, Vista also named Park as a defendant. It claimed that Park had conspired with Terri to violate the SCA. The district court dismissed the count against Park, finding that the SCA did not include any language evidencing an intent to cover secondary liability, such as conspiracy claims. Vista does not appeal this ruling.

8

or exhibits on the issues for which its Rule 30(b)(6), Fed. R. Civ. P., corporate representative was unable to provide testimony. Terri contended that, during his Rule 30(b)(6) deposition, Franklin, as the corporate representative of Vista, was unable to provide information regarding the operation of Vista's web mail account or its account information. According to Terri, Franklin was also unable to provide testimony on other issues regarding Vista's procedures with respect to its web mail account. Based on these circumstances, Terri sought for the court to preclude Vista from supplementing this deficient testimony at trial. The district court, however, summarily denied the motion.

Vista also filed a pretrial motion, seeking to exclude evidence based on the divorce proceedings. More specifically, Vista asked the district court to enter an order precluding Terri from entering into evidence the final judgment from the divorce proceedings or from testifying to the fact that the divorce court found Terri to be an owner of Vista. Terri opposed the motion, contending that the final judgment demonstrated that Terri was authorized to access its emails. The district court granted Vista's motion to exclude the divorce judgment.

### E.

The trial began on June 23, 2014. Vista elicited testimony seeking to establish that Terri was not an owner of Vista, while Terri testified to the opposite effect. Over Terri's objection, Vista also offered the testimony of its former

information-technology directors, William Somma and Jeff Gjoen. The two men testified regarding how Vista's email account was set up and how it functioned.

During his testimony, Gjoen explained that CrystalTech was the online host for Vista's email account. According to Gjoen, Franklin's Vista emails went to CrystalTech, which held the emails until the Outlook program on Franklin's computer requested the emails that had not previously been received. At that time, Outlook would "reach out" to CrystalTech to get Franklin's emails. CrystalTech then sent any emails not previously transmitted to Franklin's computer. Gjoen further noted that CrystalTech stored the emails online as a backup in case Franklin's computer crashed. So, if Franklin accidentally deleted an email, that email would not be deleted from CrystalTech's online storage. In technical terms, Gjoen and Somma testified that the Vista email system was a POP3 account (which leaves the data on the server and sends a copy to Outlook) that maintains a copy for backup.

At the close of Vista's case, Terri moved for judgment as a matter of law pursuant to Rule 50(a), Fed. R. Civ. P. In support of her motion, Terri argued that the accessed emails were not in "electronic storage" and that Vista could not recover statutory damages because it failed to demonstrate that it had suffered any actual damages. The district court reserved ruling and allowed the case to proceed.

10

Following deliberations, the jury found that Terri had violated the SCA when she accessed her husband's emails. It further concluded that Terri had committed 450 violations of the SCA. But the jury determined that Vista had sustained no actual damages as a result of Terri's actions. And, although the jury found that Terri's conduct was "willful, wanton, or malicious for the purposes of assessing punitive damages," it awarded no punitive damages to Vista. In summary, Vista recovered nothing.

A few weeks after the jury returned its verdict, at Franklin's urging, the district court conducted a hearing to determine whether it would award statutory damages to Vista. Vista argued that it was entitled to $450,000 in statutory damages—$1,000 for each violation of the SCA. In contrast, Terri contended that the district court should not award any statutory damages to Vista because the jury found that it had not suffered any actual damages. Ultimately, the district court, in an exercise of discretion, awarded Vista $50,000 in statutory damages. It also declined to award Vista punitive damages or attorney's fees, explaining that the case was "really between Franklin, a non-party, and Terri. And it [was] being driven by emotions and, perhaps, personal vendetta."

In the same order, the district court denied Terri's Rule 50(b), Fed. R. Civ. P., motion for judgment as a matter of law. In denying the Rule 50(b) motion, the district court concluded that Vista's email system fell within the SCA's definition

11

of "electronic communication service."  It further determined that the emails that Terri viewed were maintained within "electronic storage," as the SCA defines the term.  The district court also rejected Terri's argument that Vista was required to prove actual damages in order to recover statutory damages.

Vista timely appealed the district court's order awarding damages.  Terri then timely filed her cross-appeal.  Between Franklin's appeal and Terri's cross-appeal, this case raises issues relating to the following matters:  (1) the interpretation and application of the SCA; (2) jury instructions; and (3) evidentiary rulings.

## II.

We begin with the five issues that the appeals raise related to the interpretation and application of the SCA:  (1) whether Terri accessed a facility through which an electronic communication service was provided and thereby obtained access to an electronic communication while it was in "electronic storage"; (2) whether statutory damages may be awarded under the SCA, in the absence of actual damages, and, if so, how much; (3) whether the district court's instructions to the jury regarding Vista's SCA claim and damages were erroneous; (4) whether Vista was entitled to punitive damages, despite the jury's verdict declining to award such damages; and (5) whether the district court erred in not awarding Vista punitive damages and attorney's fees.

12

Many of these issues raise questions of statutory interpretation.    The interpretation of a statute, in turn, presents a question of law, subject to *de novo* review.  *Rine v. Imagitas, Inc.*, 590 F.3d 1215, 1222 (11th Cir. 2009).

In reviewing the facts to which we apply the law, we consider all of the evidence in the record, drawing all reasonable inferences in favor of Franklin, since Terri raised most of these issues in a Rule 50 motion.  *See Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 150, 120 S. Ct. 2097, 2110 (2000).  We neither make credibility determinations nor weigh the evidence.  *Id*. Finally, we "disregard all evidence favorable to [Terri] that the jury [was] not required to believe."  *Id.* at 151, 120 S. Ct. at 2010.

## A.

Vista relied on 18 U.S.C. § 2701(a)(1) to establish Terri's liability.  As relevant here, that provision makes liable anyone who "intentionally accesses without authorization a facility through which an electronic communication service is provided; . . . and thereby obtains . . . access to a wire or electronic communication while it is in electronic storage in such system . . . ."  18 U.S.C. § 2701(a)(1).

Terri asserts that when she reviewed Franklin's emails, she did not use a facility through which an electronic communication service ("ECS") was provided, and she did not access electronic communications that were in "electronic storage"

13

at the time of access.  To understand Terri's argument, knowledge of some statutory definitions is necessary.  "Electronic communication service" is defined as "any service which provides to users thereof the ability to send or receive wire or electronic communications."  18 U.S.C. § 2510(15).  As for the term "electronic storage," it is defined as follows:

> (A)    any temporary, intermediate storage of a wire or electronic communication incidental to the electronic transmission thereof; and
> (B)    any storage of such communication by an electronic communication service for purposes of backup protection of such communication.

18 U.S.C. § 2510(17).  Finally, the term "remote computing service" ("RCS") means "the provision to the public of computer storage or processing services by means of an electronic communications system."  18 U.S.C. § 2711(2).

Based on the statutory definition of "electronic storage," Terri argues that § 2701(a)'s requirement that information be accessed while it is in "electronic storage" with an ECS means that the provision protects emails only while they are still pending delivery to the addressee—or, in other words, before the emails have been opened.  In support of this contention, Terri invokes the definition of "electronic storage" under § 2710(17).  She asserts that, by its terms, § 2510(17)(A) applies to only those email transmissions still pending delivery, and § 2510(17)(B) covers information stored for only the purposes of providing backup protection for the delivery of pending email.  As a result, Terri reasons, once the

14

email has been delivered and opened, the continued storage of it ceases to serve the purpose of backing up the email transmission until delivery has been completed. Instead, Terri urges, the service provider begins to operate as an RCS, simply storing the already-delivered emails until they are deleted. And, Terri asserts, information stored on an RCS is not protected by § 2701(a). Finally, Terri argues that since the emails she read had already been opened by Franklin, they were not in "electronic storage" but rather were in an unprotected RCS.

Much debate surrounds the issues that Terri raises. *See, e.g.*, *Theofel v. Farey-Jones*, 341 F.3d 978 (9th Cir. 2003), *as amended by* 359 F.3d 1066 (9th Cir. 2004); *In re DoubleClick Inc. Privacy Litig.*, 154 F. Supp. 2d 497, 511-12 (S.D.N.Y. 2001); *Cheng v. Romo*, No. 11-10007-DJC, 2013 WL 6814691, *3-4 (D. Mass. Dec. 20, 2013); *Pure Power Boot Camp v. Warrior Fitness Boot Camp*, 587 F. Supp. 2d 548, 555-56 (S.D.N.Y. 2008); Office of Legal Education, Executive Office for U.S. Attorneys, Searching and Seizing Computers and Obtaining Elec. Evidence in Criminal Investigations, at 124; Orin Kerr, *A User's Guide to the Stored Commc'ns Act, and a Legislator's Guide to Amending It*, 72 Geo. Wash. L. Rev. 1208 (2004). But we need not wade into the discussion because Terri's trial testimony moots her argument.

During trial, Terri conceded that, at least some of the time, she reviewed Franklin's emails before he opened them. The parties do not appear to dispute that

15

emails that had not been opened by Franklin were maintained in "electronic storage" by a service operating as an ECS. We agree.

The language of the statutory definitions of "electronic communication service" and "electronic storage" dictates this result. *See United States v. Steele*, 147 F.3d 1316, 1318 (11th Cir. 1998) (en banc) (citation and quotation marks omitted) ("In construing a statute we must begin, and often should end as well with the language of the statute itself."). On this record, CrystalTech qualified as an ECS because it was a service that provided Vista's employees with the ability to send and receive electronic communications, including emails.[5] *See* 18 U.S.C. § 2510(15). Likewise, before the emails that Franklin's Vista account received were opened, these electronic communications were in electronic storage with CrystalTech for the purposes of providing backup protection of Franklin's emails, at least until such time as Franklin received and opened them on his computer. *See* 18 U.S.C. § 2510(17)(B). As a result, the emails that Terri accessed before Franklin did were subject to the protections of 18 U.S.C. § 2701(a) at the time that she reviewed them.

And, for the reasons we discuss in Section II.B, it makes no difference to the judgment in this particular case whether Terri violated the SCA once or 450 times.

_____

[5] We note that classification of service providers under the SCA's definitions depends on how they are operating in a given context. In other words, a single service provider may act as an ECS at times and an RCS at other times.

16

Consequently, the fact that Terri accessed at least one protected email moots the issue Terri raises about whether the emails were maintained by an ECS in electronic storage when she read them after Franklin had already opened them.

**B.**

Next, both Franklin and Terri challenge the district court's interpretation of the damages provision applicable to violations of § 2701(a).  Section 2707 governs civil actions brought under the SCA and sets forth available relief for violations of § 2701(a).  It provides, in relevant part,

> **(a)** **Cause of action.**—Except as provided in section 2703(e), any provider of electronic communication service, subscriber, or other person aggrieved by any violation of this chapter in which the conduct constituting the violation is engaged in with a knowing or intentional state of mind may, in a civil action, recover from the person or entity . . . which engaged in that violation such relief as may be appropriate.
>
> **(b)** **Relief.**—In a civil action under this section, appropriate relief includes—
>
> **(1)** such preliminary and other equitable or declaratory relief as may be appropriate:
>
> **(2)** damages under subsection (c); and
>
> **(3)** a reasonable attorney's fee and other litigation costs reasonably incurred.
>
> **(c)** **Damages.**—The court may assess as damages in a civil action under this section the sum of the actual damages suffered by the plaintiff and any profits made by the violator as a result of the violation, but in no case shall a person entitled to recover receive less than the sum of $1,000.   If the violation is willful or intentional, the court may assess punitive damages.   In the case of a

17

successful action to enforce liability under this section, the court may assess the costs of the action, together with reasonable attorney fees determined by the court.

• . . .

18 U.S.C. § 2707.

Franklin argues that § 2707(c) required the district court to award him $1,000 in statutory damages for each of the 450 violations that the jury found—or $450,000. Terri, on the other hand, asserts that that the statute precluded the district court from awarding Franklin any money in statutory damages because the jury returned a verdict reflecting that Franklin incurred no actual damages as a result of the 450 violations, and statutory damages may be awarded only upon a finding of actual damages. For its part, the district court rejected both constructions and concluded that § 2707 authorized the district court to exercise its discretion to award statutory damages in an amount that the district court deemed appropriate—$50,000. We agree with Terri.

Several canons of statutory construction guide us in our analysis. Of course, we once again begin our statutory interpretation with the language of the statute we are construing. *See Steele*, 147 F.3d at 1318. In evaluating the language, we assume that Congress employed the common and ordinary meaning of the terms in the statute, and we give full effect to each of the provisions. *United States v. DBB,*

18

*Inc.*, 180 F.3d 1277, 1281 (11th Cir. 1999).  We must consider any specific terms

and the particular provision at issue in light of the entire statutory context.  *Id.*

### 1.

Our determination of whether a litigant must prove actual damages to

receive statutory damages hinges on the meaning of the phrase "person entitled to

recover," which appears in the first sentence of § 2707(c).  Notably, in *Doe v.*

*Chao*, 540 U.S. 614, 124 S. Ct. 1204 (2004), the Supreme Court construed the

materially indistinguishable phrase "person entitled to recovery" under the Privacy

Act, 5 U.S.C. § 552a, to require a finding of actual damages before statutory

damages may be awarded.  Although the Court accounted in its analysis for

general tort law and the legislative history of the Privacy Act, the Court relied

heavily on the language and grammatical structure of the statute, as well as the

concern for endowing every word of the statute with meaning.

The Privacy Act provision at issue in *Doe* was 5 U.S.C. § 552a(g)(4):

> In any suit brought under the provisions of subsection (g)(1)(C) or (D) of this section in which the court determines that the agency acted in a manner which was intentional or willful, the United States shall be liable to the individual in an amount equal to the sum of—
> (a)  ***actual damages sustained by the individual as a result of the refusal or failure, but in no case shall a person entitled to recovery receive less than the sum of $1,000***; and
> (b)  the costs of the action together with reasonable attorney fees as determined by the court.

(emphasis added).    The Supreme Court made three observations about the language of the Privacy Act's damages provision that are directly applicable in our analysis of the language of the SCA.

First, the Supreme Court opined that the "simplest reading" of the phrase "person entitled to recovery" in § 552a(g)(4)(a) "looks back to the immediately preceding provision for recovering actual damages," which appears earlier in the same sentence.  *See Doe*, 540 U.S. 614, 620, 124 S. Ct. 1204, 1208 (2004).  So under "a straightforward textual analysis" of the damages provision at issue in *Doe*, "[w]hen the statute gets to the point of guaranteeing the $1,000 minimum [in § 552a(g)(4)], it . . . has provided expressly for liability to . . . victims for 'actual damages sustained.'"  *Id.*

The SCA damages provision includes exactly the same phrase—"but in no case shall a person entitled to recovery receive less than the sum of $1,000"—as the Privacy Act damages provision.  And just as with the Privacy Act damages provision (which specifies the kind of damages to be awarded upon a finding of intentional or willful action), the "but in no case . . ." clause in § 2707(c) of the SCA's damages provision immediately follows a statement of the specific types of damages available upon a knowing or intentional violation of the statute.  As a result, "a straightforward textual analysis," *Doe*, 540 U.S. at 620, 124 S. Ct. at 1208, demands the conclusion that the phrase "person entitled to recover" in §

20

2707(c) includes only those persons who have proved actual damages suffered or profits received by the defendant through violation of the SCA.

Second, the Supreme Court noted that its interpretation of the Privacy Act's damages provision accounted for the phrase "entitled to recovery," which appears in § 552a(g)(4)(a), but a construction of the damages provision to allow for statutory damages without actual damages would necessarily ignore the phrase "entitled to recovery." *Id.* at 623, 124 S. Ct. at 1210. As the Supreme Court explained, if Congress had intended for any person who proved a Privacy Act violation to recover statutory damages without respect to whether that person had received any other type of damages relief, it could have omitted the phrase "entitled to recovery" and provided simply for "actual damages sustained by the individual as a result of the refusal or failure, but in no case shall a person receive less than the sum of $1,000." *Id.* Since Congress chose not to write the statute that way, courts should give meaning to the words "entitled to recovery" because that may be done reasonably. *See id.*

As with the Privacy Act's damages provision, construing the SCA damages provision to allow for statutory damages upon a finding of violation without a corresponding finding of specified damages would render the phrase "person entitled to recover" meaningless. Had Congress intended to allow for recovery of statutory damages under § 2707(c) in the absence of proof of specified damages, it

21

could have deleted the phrase "entitled to recover," just as it could have in the Privacy Act's damages provision.

Third, in *Doe*, the Supreme Court found that the location of Congress's placement of the "entitled to recovery" language in § 552a(g)(4)(A) provided further indication of congressional intent that the phrase "person entitled to recovery" refer to only a person who proves actual damages, not to a person who simply demonstrates a violation of the statute. *Doe*, 540 U.S. at 620-21, 124 S. Ct. at 1208-09. As the Supreme Court explained, if a willful and intentional violation of the Privacy Act were, in and of itself, enough to entitle a person to recovery of statutory damages, "Congress could have conditioned the entire subsection (g)(4)(A) as applying only to 'a person entitled to recovery.'" *Id.* at 621 n.2; 124 S. Ct. at 1209 n.2. In other words, Congress could have written subsection (g)(4)(A) to say, "For a person entitled to recovery, actual damages sustained by the individual as a result of the refusal or failure, but in no case less than the sum of $1,000." But Congress did not do that. Instead, Congress deployed the "entitled to recovery" modifier "only after referring to an individual's actual damages, indicating that 'actual damages' is a further touchstone of the entitlement" to statutory damages. *Id.*

Relatedly, the Supreme Court observed that the Privacy Act's damages provision "does not speak of liability [for statutory damages] (and consequent

22

entitlement to recovery) in a freestanding, unqualified way, but in a limited way, by reference to enumerated damages." *Id.* at 620-21, 124 S. Ct. at 1208-09. In other words, as the Privacy Act uses the term "liability," it necessarily links liability for statutory damages with proof of actual damages. Notably, the Privacy Act's damages provision separately links the meaning of "liab[ility]" for a willful or intentional violation to "the costs of the action together with reasonable attorney fees as determined by the court." 18 U.S.C. § 552a(g)(4)(B).

The SCA, like the Privacy Act, does not equate a defendant's freestanding, unqualified liability in general with a plaintiff's "entitle[ment] to recover" statutory damages. Instead, as in the Privacy Act, Congress placed the "entitled to recover" limitation in the first sentence of § 2707(c) after its reference to actual damages or a violator's profits, indicating that actual damages or profits are further touchstones of a plaintiff's entitlement to statutory damages. Also like the Privacy Act, the SCA (and § 2707(c) in particular) provides for the availability of other types of relief, including the following, in separate sentences that are not modified by the phrase "entitled to recover": "In the case of a ***successful action to enforce liability*** under this section, the court may assess the costs of the action, together with reasonable attorney fees determined by the court." 18 U.S.C. § 2707(c) (emphasis added). So like the Privacy Act, the SCA contemplates liability for attorney's fees, even in the absence of actual damages, because the sentence providing for

23

attorney's fees speaks in terms of liability for attorney's fees without reference to "entitle[ment] to recover" actual damages.

Put simply, to give effect to all of the language in § 2707(c), we understand the phrase "entitled to recover" to refer to something different than "liability" as the terms are employed in the SCA. Had Congress intended for "entitled to recover" to mean the same thing as proof of general liability for a violation of the SCA, there would have been no reason to use these separate phrases in the same subsection of the SCA's damages provision.

## 2.

Besides the statutory language, we find the relationship of the SCA to the Wiretap Act to bear on the framework of our textual analysis. The SCA was enacted as Title II of the Electronic Communications Privacy Act of 1986 ("ECPA"), legislation that also included amendments to the Wiretap Act, 18 U.S.C. § 2510, *et seq.*, and created the Pen Register and Trap and Trace Devices statute, 18 U.S.C. §§ 3121-3126.

Through the ECPA, Congress endeavored to modernize the Wiretap Act and to provide protection for forms of communication that did not generally exist in 1968, when the Wiretap Act was originally enacted. H.R. Rep. No. 99-647, at 17 (1986). As the House Committee on the Judiciary explained, the Wiretap Act originally protected "telephone conversations and face-to-face oral

24

communications [] against electronic eavesdropping" and "limited the concept of interception to the 'aural acquisition' of the contents of a communication." *Id.* It made no effort to protect against the "interception of text, digital or machine communication." *Id.* Among other purposes, Congress intended for the ECPA to fill this gap. *Id.*

Because the SCA and the amended Wiretap Act were both a part of the ECPA, meaning that they were enacted together and they were designed to work together, the damages provision of the amended Wiretap Act provides helpful insight into the meaning of the damages provision of the SCA. As amended by the 1986 legislation, the Wiretap Act's damages provision stated, in relevant part,

> **(a)** **In General.**—Any person whose wire, oral, or electronic communication is intercepted, disclosed, or willfully used in violation of this chapter may in a civil action recover from the person or entity which engaged in that violation such relief as may be appropriate.
> **(b)** **Relief**.—In an action under this section, appropriate relief includes—
> (1) such preliminary and other equitable or declaratory relief as may be appropriate;
> (2) damages under subsection (c) and punitive damages in appropriate cases; and
> (3) a reasonable attorney's fee and other litigation costs reasonably incurred.
> **(c)** **Computation of Damages.**—The court may assess as damages in an action under this section whichever is the greater of—
> (1) the sum of the actual damages suffered by the plaintiff and any profits made by the violator as a result of the violation; or

25

> (2)    statutory damages of whichever is the greater of $100 a day for each day of violation or $10,000.

18 U.S.C. § 2520 (1986).

Comparison of the SCA and Wiretap Act damages provisions enacted in the same piece of legislation reveals that the general structure of both statutes is the same. We find this fact to be of particular significance, since Congress essentially scrapped the prior damages provision of the Wiretap Act and started over when it amended the Wiretap Act in 1986. As a result, it is clear that the disparities between the contemporaneously enacted 1986 version of the Wiretap Act's damages provision and the SCA's damages provision are distinctions with meaningful differences.

Beginning with the similarities in structure between the two provisions, in both damages sections, subsection (a) establishes a victim's right to recover "such relief as may be appropriate," a term that is defined by subsection (b). Subsection (b) of each statute, in turn, articulates the general categories of "appropriate relief" that may be awarded. Notably, the categories set forth in subsection (b) of the SCA line up closely with those identified in subsection (b) of the Wiretap Act. Finally, subsection (c) of each statute elaborates on the meaning of "damages" as set forth in subsection (b) of each statute.

But this is where the statutes diverge, "[a]nd that [makes] all the difference."[6] Subsection (c) of the Wiretap Act's damages provision authorizes the court to assess as damages "the greater of" actual damages and profits made by the violator from violation *or* statutory damages, 18 U.S.C. § 2520(c). Subsection (c) of the SCA's damages provision, on the other hand, offers the district court no choice. Rather, it allows the district court to award only "actual damages suffered by the plaintiff and any profits made by the violator as a result of the violation." The part of the provision authorizing statutory damages does not present the district court with an express option to award statutory damages instead of actual damages and profits; it merely modifies the measure of "actual damages suffered" and "profits made by the violator" by providing a floor for when any award for those damages is entered.

If, as Franklin argues, Congress intended for the SCA to allow a party to choose between actual damages and statutory damages, the contemporaneously enacted amendments to the Wiretap Act certainly demonstrate that Congress knew how to say so. But Congress did not do that. The wording of the damages provisions of the Wiretap Act and the SCA is not the same, and we must give effect to the differences between them, particularly since they were enacted as part of the same legislation.

---

[6] Robert Frost, "The Road Not Taken."

27

Nor is it surprising that in 1986, when the ECPA was enacted, Congress chose to create different remedies for the Wiretap Act and the SCA. Unlike wire communications, which had been in mainstream use for many years and which had an established role in our society in 1986, email use was neither widespread nor even well-known in the general community at the time that Congress enacted the SCA.[7] Congress could not have foreseen email's future ubiquity, so it made sense for Congress to have proceeded with caution in authorizing awards of statutory damages in the infancy of the technology, before society had a full picture of the way mainstream use of email would work in practice. Indeed, so new was the technology that the House Report had to explain what email was, which it did in a description that some today may find quaint.[8]

---

[7] In fact, the iconic movie *You've Got Mail* was not even released until 1998. The movie, which stars Tom Hanks and Meg Ryan, took its name from the alert that AOL's email system offered to its subscribers. AOL, in turn, did not even begin to offer commercial email service until 1989—three years after Congress enacted the SCA, and another four years passed before AOL launched its famous marketing campaign where it mailed compact disks allowing for easier access to AOL's email service and, according to AOL, making the company a "household name." *See* http://corp.aol.com/2010/05/24/youve-got-25-years-aol-celebrates-25th-anniversary-with-bi/ (last visited Dec. 7, 2015).

[8] That description reads,

> One of the most popular new computer services is electronic mail, a service which combines features of the telephone and regular first class mail. Electronic mail can include telex, teletext, facsimile, voice mail and mixed systems that electronically transmit and store messages. Many e-mail users have found it a useful substitute for telephone calls, while others utilize it instead of the government post service.

H.R. Rep. 99-647, at 22.

28

In addition, the SCA's damages provision must be understood in comparison to Congress's overall treatment of the Wiretap Act versus the SCA. The Wiretap Act concerns itself with the interception of real-time communications, whereas the SCA addresses stored communications. The legislative history of the 1986 amendments suggests (and we agree) that the Fourth Amendment demands that the government demonstrate probable cause both to intercept real-time wire, oral, and electronic communications and to review the content of stored electronic communications. *See*, *e.g.*, *id.* at 22 ("It appears likely, however, that the courts would find that the parties to an e-mail transmission have a 'reasonable expectation of privacy' and that a warrant of some kind is required."); *United States v. Warshak*, 631 F.3d 266, 288 (6th Cir. 2010) (holding that "a subscriber enjoys a reasonable expectation of privacy in the contents of emails 'that are stored with, or sent or received through, a commercial ISP"); *see also United States v. Davis*, 785 F.3d 498, 528-29 (11th Cir. 2015) (Rosenbaum, J., concurring) (noting that "our expectation of privacy in our personal communications has not changed from what it was when we only wrote letters to what it is now that we . . . happen to use email to personally communicate.").

Despite the equal protection that the Constitution gives to the two types of communications, Congress has chosen to subject the government's real-time interceptions of wire, oral, and electronic communications to more stringent

29

requirements than the Fourth Amendment requires and than it has imposed on government review of the content of stored electronic communications. For example, while the Wiretap Act limits the availability of wiretaps to government investigations involving a specified list of crimes, *see* 18 U.S.C. § 2516(1), the SCA contains no similar limitation.

In addition, to obtain a wiretap order, the government must show not only probable cause of a criminal violation and probable cause that evidence of that violation will be found in the communications to be intercepted—all that the Fourth Amendment itself requires. It must also provide all of the following:

> (c)    a full and complete statement as to whether or not other investigative procedures have been tried and failed or why they reasonably appear to be unlikely to succeed if tried or to be too dangerous;
>
> . . .
>
> (e)    a full and complete statement of the facts concerning all previous applications known to the individual authorizing and making the application, made to any judge for authorization to intercept, or for approval of, wire, oral, or electronic communications involving any of the same persons, facilities or places specified in the application, and the action taken by the judge on each such application; and
>
> (f)    where the application is for the extension of an order, a statement setting forth the results thus far obtained from the interception, or a reasonable explanation of the failure to obtain such results.

18 U.S.C. § 2518(1).  The judge considering the wiretap application may also "require the applicant to furnish additional testimony or documentary evidence in support of the application." 18 U.S.C. § 2518(2).

But with respect to review of the content of stored electronic communications, the SCA imposes no requirements on the government beyond obtaining a warrant, which the Fourth Amendment already generally requires, anyway.[9]  *See* 18 U.S.C. § 2703(a), (b).  In other words, Congress has created an extra layer of security against the government's real-time interception of wire, oral, and electronic communications that it has not decided to impose on the government's review of the content of stored electronic communications.[10]

In light of this fact, it would be inconsistent, to say the least, if Congress treated civil violations of the SCA more severely than civil violations of the Wiretap Act.  But Franklin's proposed construction of the SCA—that it provides for $1,000 in statutory damages for each violation—would do just that.[11]  In the pending case, for example, Franklin's proposed interpretation of the SCA would

---

[9] In fact, depending on the age of the stored communications and other circumstances, the SCA purports to authorize inspection of content without a warrant in some circumstances.  *See* 18 U.S.C. § 2703(b).  We do not have occasion to opine here on the constitutionality of this particular provision.

[10] The SCA's treatment of the content of stored electronic communications has not materially changed since the statute was enacted in 1986.  *See* Pub. L. 99-508 at § 2703(a), (b).

[11] We acknowledge that a construction of § 2707(c) to provide for an award of a total of $1,000 in statutory damages per civil action (not per violation), even in the absence of actual damages, would not suffer from this same defect, since the minimum award of statutory damages under the Wiretap Act is $10,000.  Nevertheless, that interpretation of the statute is problematic for the other reasons we have discussed in this opinion.

31

result in an award of $450,000 ($1,000 per violation x 450 violations). Under the Wiretap Act, though, the award would be, at most, $24,400—or roughly twenty times less than under the SCA—for the same 450 violations—even if the violations occurred separately on every day of the period in question ($100 per day x 244 days (244 days in the months October 2011 through May 2012)).[12] That just can't be right. Section 2707(c) does not provide for a statutory award of $1,000 per violation, even when a plaintiff proves actual damages or a violator's profits. Rather, it establishes a floor award of $1,000—regardless of the number of violations—when a plaintiff shows actual damages or a violator's profits.

### 3.

We are not the first court to hold that the SCA does not authorize an award of statutory damages in the absence of an award for actual damages or profits realized by the offender. The Fourth Circuit has reached this same conclusion. *See Van Alstyne v. Elec. Scriptorium, Ltd.*, 560 F.3d 199 (4th Cir. 2009).

While Vista argues that *Van Alstyne* "has repeatedly been called into question for faulty reasoning," we are not persuaded by the rationales of the district-court and state-court opinions on which Vista relies. Other courts have disagreed with the result that we and *Van Alstyne* reach, based on their views of the

---

[12] Even if we assumed that the 450 violations occurred on 450 different days, the highest award under the Wiretap Act's damages provision would be $45,000—still ten times less than under Franklin's urged interpretation of the SCA's damages provision.

language of § 2707(c), the legislative history of the provision, and policy reasons. We consider their reasoning and explain below why we respectfully disagree with it and therefore with Vista.

**a.**

With regard to the statutory language, other courts that have concluded that statutory damages are available in the absence of actual damages have attempted to distinguish *Doe*'s interpretation of the Privacy Act language by reasoning, "In [the Privacy Act], the restrictive language *shall be liable* seems to dictate actual damages as the only remedy in that clause, whereas in § 2707(c), the language that the court *may* assess the sum of actual damages and any profits seems to offer that formula as one means of calculation." *Shefts v. Petrakis*, 931 F. Supp. 2d 916, 918 (C.D. Ill. 2013).

But the Supreme Court did not ground its determination that the Privacy Act precluded statutory damages in the absence of actual damages, on the mandatory nature of an award of actual damages under the Privacy Act. Rather, the Court based its textual reading of the Privacy Act's damages provision on the sentence structure of the sentence containing the "but in no case" clause—the same sentence structure that exists in the SCA's damages provision. And the reading of the SCA's damages provision proposed in these other opinions conflicts directly with the Supreme Court's "straightforward textual analysis" of the materially

33

indistinguishable language of the Privacy Act's damages provision.  *See Doe*, 540 U.S. at 620, 124 S. Ct. at 1208.

Moreover, we respectfully disagree that the language of the Privacy Act is distinguishable on the grounds suggested by these other cases.  Indeed, even some of the courts that have concluded that the SCA authorizes an award of statutory damages without proof of actual damages have conceded that the language of the Privacy Act analyzed in *Doe* is "very similar to the language in the ECPA."  *Cedar Hill Assocs., Inc. v. Paget*, No. 04C0557, 2005 WL 3430562, at *3 (N.D. Ill. Dec. 9, 2005); *see also In re Hawaiian Airlines, Inc.*, 355 B.R. 225, 230 (D. Haw. 2006) ("In *Doe* . . . , the Supreme Court addressed language found in the Privacy Act of 1974 that is nearly identical to the statutory damage language in the [SCA].").

Nor do we find anything inconsistent in the use of the word "may" in § 2707(c) and the notion that the statute limits the availability of statutory damages to those who have showed actual damages or profits by the violator.  Rather, use of the word "may" in the first sentence of § 2707(c) conveys only that, where actual damages or a violator's profits exist, a court has discretion to decide whether to award to the plaintiff actual damages or profits of the violator, or both or neither, when these damages exceed $1,000, instead of awarding just $1,000 in statutory damages.

34

Some courts have also attempted to distinguish the language of the Privacy Act from that of the SCA on the following basis:

> The [SCA] . . . states that "any provider of electronic communication service, subscriber, or other person aggrieved by a violation of this chapter . . . may, in a civil action, recover from the person or entity . . . which engaged in that violation." . . . Thus, unlike the Privacy Act, the [SCA] explicitly states that a person aggrieved by a violation of the Act may recover and this recovery is not tied to actual damages or profits.

*In re Hawaiian Airlines, Inc.*, 355 B.R. at 230. We respectfully disagree with this reasoning because subsection (a) does not end with the phrase "in that violation." And the language omitted from the opinion's recitation of subsection (a)—that a "person aggrieved by any violation of this chapter . . . may . . . recover . . . ***such relief as may be appropriate***[,]" 18 U.S.C. § 2707(a) (emphasis added)— necessarily limits the universe of aggrieved plaintiffs who may recover to those who can make the necessary showings to obtain relief that Congress has deemed "appropriate" in subsections (b) and (c). That, in turn, brings us back to the meaning of the "but in no case" clause in subsection (c). For reasons we have already explained, the language of subsection (c) supports the conclusion that a plaintiff must prove entitlement to actual damages or profits of the violator in order to be eligible to receive statutory damages.

35

**b.**

The opinions on which Vista relies have identified two reasons why the legislative history of § 2707 purportedly supports the determination that no actual damages are required for an award of statutory damages: (1) in *Doe*, "the Supreme Court distinguished the SCA as irrelevant to the interpretation of the Privacy Act" based on the two statutes' respective legislative histories; and (2) the House and Senate Reports supporting the SCA legislation support the conclusion that Congress intended for statutory damages to be available even in the absence of actual damages and a violator's profits. *See Shefts*, 931 F. Supp. 2d at 918-919. We are not convinced by either reason.

First, while *Doe* did decline to consider the legislative history of the SCA in construing the meaning of the Privacy Act, it did so because the SCA was a separate statute "passed well after the Privacy Act." *Doe*, 540 U.S. at 626, 124 S. Ct. at 1212. As the Supreme Court explained, "subsequent legislative history will rarely override a reasonable interpretation of a statute that can be gleaned from its language and legislative history prior to its enactment." *Id.* at 626-27, 124 S. Ct. at 1212 (citation and internal quotation marks omitted). In making this observation, however, the Supreme Court did not suggest that the legislative history of the SCA supports the conclusion that statutory damages are available in the absence of actual damages or even opine on the legislative history of the SCA at all. And,

36

more significantly, the fact that the Privacy Act and the SCA have different legislative histories does nothing to undermine the similarity of the language employed in both damages provisions and the Supreme Court's textual analysis of that language.

Second, with regard to the legislative history of the SCA, we note at the outset that we do not consider a statute's legislative history where the statute's text is clear. *CBS Inc. v. PrimeTime 24 Joint Venture*, 245 F.3d 1217, 1227 (11th Cir. 2001). But even to the extent that, after *Doe*, the language employed in § 2707(c) may be viewed as ambiguous,[13] the legislative history fails to clarify congressional intent about whether Congress meant to allow statutory damages in the absence of actual damages.

Courts concluding that the SCA's legislative history indicates that Congress intended for statutory damages to be available in the absence of actual damages point to the House Report and the Senate Report in support of its point. With respect to the Senate Report, these courts point to the following language: § 2707(c) provides for "damages . . . including the sum of actual damages suffered by the plaintiff and any profits made by the violator as the result of the violation as provided in (c) with minimum statutory damages of $1,000." *See Shefts*, 931 F.

---

[13] In *Doe*, the Supreme Court apparently viewed the language of the Privacy Act as at least somewhat ambiguous, as it went on to explicate the Act's legislative history. *See Doe*, 540 U.S. at 622-23, 124 S. Ct. at 1209-10.

37

Supp. 2d at 918-919 (quoting S. Rep. No. 99-541, at 43, 1986 U.S.C.C.A.N. 3555, 3597).

This sentence construes the Senate version of the bill, which ultimately did not become § 2707(c). *Compare* S. Rep. No. 99-541, at 82 *and* 18 U.S.C. § 2707(c) (1986). Significantly, the Senate version of the bill did not authorize punitive damages, but the enacted version of § 2707(c) does. While we have been unable to find an express explanation in the legislative history for why Congress chose the version of § 2707(c) that provided for punitive damages over the version that did not when it enacted the SCA, the difference is significant. It allows the statute to serve as a deterrent to would-be violators even when they think their violations will inflict no actual damages, and it permits victims to recover in an appropriate case even when they can prove no actual damages. *See Van Alstyne*, 560 F.3d at 209 (holding that the SCA includes statutory language making punitive damages recoverable even in the absence of proof of actual damages).[14] Conceivably, the availability of punitive damages under the adopted version of the

---

[14] As the Fourth Circuit explained,

> The SCA, we believe, provides . . . language [revealing congressional intent not to limit the availability of punitive damages to cases where proof of actual damages has been shown]. Section 2707(c) states, "[i]f the violation [of the SCA] is willful or intentional, the court may assess punitive damages." 18 U.S.C.A. § 2707(c). This sentence lacks the limiting language associated with the award of actual damages and statutory damages, with no references to persons "entitled to recover." The sole limitation is that the violation of the SCA be "willful or intentional[.]"

*Van Alstyne*, 560 F.3d at 209.

38

statute could have been a consideration in Congress's determination of whether to provide for statutory damages in the absence of actual damages and a violator's profits.

But even setting aside the fact that the cited legislative history comes from the version of the bill that was not enacted, it simply cannot bear the weight that it must carry to provide clear evidence of congressional intent that statutory damages be available in the absence of actual damages. Presumably, the courts citing this language rest their reasoning on the Senate Report's use of the word "with" in the phrase "damages . . . including the sum of actual damages suffered by the plaintiff and any profits made by the violator as the result of the violation as provided in (c) with minimum statutory damages of $1,000."

But "with" could mean "in addition to," among other common definitions, "with" can also be "[u]sed as a function word to indicate accompanying detail or condition: *just sat there with his mouth open*." *With*, The Am. Heritage Dictionary of English Language (4th ed. 2000). Under this definition, "with" does nothing more in the quoted sentence of the Senate Report than detail the minimum award for actual damages and a violator's profits, where actual damages or a violator's profits exist in the first place.

As for the House Report, opinions concluding that Congress intended for statutory damages to be available in the absence of actual damages rely on the following passage:

> Congress expressly states that "subsection (c) provides the *measure* of damages under this section." H.R. Rep. No. 99-647, at 74 (1986) (emphasis added). The House Report accompanying the SCA further explains that "damages *include* actual damages, any lost profits but in no case less than $1,000," and the decision to use the word "include" implies that recovery is not strictly limited to actual damages but rather encompasses a broader scope. *Id.* (emphasis added).

*Shefts*, 931 F. Supp. 2d at 918. Most respectfully, it is not apparent to us how the use of the term "measure" indicates that Congress intended statutory damages to be available in the absence of actual damages or a violator's profits. $0 in statutory damages in the absence of actual damages or a violator's profits is just as much a measure of damages as $1,000 in statutory damages where actual damages or a violator's profits, or both, exist but total less than $1,000, or an award in excess of $1,000 where actual damages or a violator's profits, or both, exceed $1,000.

With regard to the word "include," we first note that it can introduce an exclusive list or a partial list. But even assuming that Congress intended the second meaning, the sentence using the word "include" does not set forth all types of damages that § 2707(c) expressly authorizes. Rather, § 2707(c) also expressly

40

provides for the imposition of punitive damages.  So the form of damages missing from the list in the House Report could just as easily refer to punitive damages.

Particularly in view of the legislative history of the ECPA as a whole—and the apparent deliberate difference between the damages provisions of the Wiretap Act and the SCA, we do not find the quoted sentences from the House and Senate Reports to shed any light on, much less give a clear indication of, congressional intent.

### c.

Some opinions on which Vista relies also invoke a policy reason for allowing an award of statutory damages without actual damages or profits.  They explain, "[A]ctual damages may often be very difficult to prove in SCA cases, when, for example, the SCA violation is an unauthorized access of email which results in no financial harm to the plaintiff."  *Shefts*, 931 F. Supp. 2d at 918.  We can certainly appreciate this concern.  But as we have mentioned, the SCA accounted for this issue in its own way.  Unlike the Privacy Act, subsection (c) of the SCA authorizes the court to assess punitive damages where violations are willful or intentional.[15]  As a result, the SCA provides a substantial deterrent to

---

[15] The *mens rea* necessary to establish a violation supporting an award of actual damages or profits is "knowing or intentional."  *See* 18 U.S.C. § 2707(a).  It is difficult to conceive of a violation of § 2707(c) that would not be intentional.  Because an "intentional" violation also justifies an award of punitive damages, as a practical matter, virtually all violations under § 2707(a) are subject to an award of punitive damages.  Nor do the terms of § 2707 place any limitation on the size of an award of punitive damages.

would-be violators and a meaningful source of recovery to victims in appropriate cases, even in the absence of statutory damages. We must respect Congress's permissible choice in handling this issue.

For all of these reasons, we respectfully disagree with Vista that *Van Alstyne* is based on "faulty reasoning" or that it is undermined by the reasoning of opinions reaching the opposite conclusion.

## C.

Terri challenges two jury instructions on appeal: (1) Jury Instruction No. 8, relating to the definition of "electronic storage" under the SCA, and (2) Jury Instruction No. 9, regarding damages under the SCA. But Terri failed to object to these instructions before the jury deliberated.

Rule 51, Fed. R. Civ. P., provides that objections to jury instructions must be made at a hearing before instructions and arguments are delivered or promptly upon learning that the challenged instruction will be, or has been, given or refused, whichever occurs first. *See* Fed. R. Civ. P. 51(c)(2). Where, as here, a party fails to timely object, Rule 51(d)(2), Fed. R. Civ. P., provides for plain-error review "if the error affects substantial rights."

Under plain-error review, a party must show (1) an error occurred; (2) the error was plain; (3) the error affected substantial rights; and (4) failure to correct the error would "seriously affect the fairness of the judicial proceeding." *Farley v.*

*Nationwide Mut. Ins. Co.*, 197 F.3d 1322, 1329 (11th Cir. 1999).   We have previously recognized the strict construction of the plain-error test that we apply in the context of erroneous jury instructions.  *Id.*  As we have explained, "[R]eversal for plain error in the jury instructions or verdict form will occur only in *exceptional cases* where the error is so fundamental as to result in a miscarriage of justice."  *Id.* (emphasis in original) (citations and internal quotation marks omitted).  Satisfying this standard requires a party to prove that the "challenged instruction was an incorrect statement of the law and [that] it was probably responsible for an incorrect verdict, leading to substantial injustice."   *Id.* (citations and internal quotation marks omitted).  We have described this standard as requiring an error of law that is "so prejudicial as to have affected the outcome of the proceedings."  *Id.* (citation and internal quotation marks omitted).  Terri cannot satisfy this showing.

**1.**

In Jury Instruction No. 8, the district court instructed the jury that, for a violation of the SCA to have occurred, the accessed emails must have been in "electronic storage."   The district court then explained that the SCA defines "electronic storage" as "(A) any temporary, intermediate storage of a wire or electronic communication incidental to the electronic transmission thereof; and (B) any storage of such communication by an electronic communication service for purposes of backup protection of such communication."   In addition, the district

court stated that under subsection (B), "e-mails retained by an online host after delivery constitute storage for the purpose of 'backup protection.'  In other words, backup storage includes post-transmission storage, even if the e-mail has been previously read by the user, *i.e.*, *Franklin Burkett*."  Echoing her arguments on appeal of the denial of her motion for judgment as a matter of law, Terri asserts that the last part of the jury instruction constituted an incorrect statement of the law because messages that are in post-transmission storage (emails that have been opened), after transmission is complete are not in "electronic storage."

Even if we assume without deciding that the district court's instruction was error, we have held that "a court's reasonable interpretation of the contours of an area of legal uncertainty hardly could give rise to plain error when those contours are . . . in a state of evolving definition and uncertainty."  *Heath v. Suzuki Motor Corp.*, 126 F.3d 1391, 1394 (11th Cir. 1997).  Here, that's exactly the case.  As we have noted in Section II.A of this opinion, considerable disagreement exists over whether, and if so, under what conditions, opened email transmissions may qualify as being held in "electronic storage."  Because the law with regard to this issue is far from settled, it cannot form the basis for a finding of plain error.

## 2.

Terri's second challenge to the jury instructions fares no better.  In Jury Instruction No. 9, the district court instructed,

> If you find that Defendant, Terri Burkett, violated the [SCA], you shall determine how many times she violated the Act by intentionally accessing the web-mail account of Vista Marketing, LLC or the email subaccount of Frank Burkett without authorization or in excess of any prior authorization. You shall then record the number of violations on your verdict form.

Terri contends that the instruction was erroneous because it failed to inform the jury that, upon a finding of a violation, Terri would be liable for statutory damages or that the judge would then determine statutory damages based on the jury's finding of the number of violations under the SCA.

Terri has not showed plain error. First, Terri points to nothing affirmatively erroneous in the instruction, and we find nothing. Rather, Terri argues that the instruction is incomplete or misleading because it does not include further information. But not only did Terri fail to object to the omission in the instruction of the points about which she now complains, Terri never requested a supplement to the instruction. And a court cannot err by not providing a special instruction that a party did not request. *Wood v. President & Trustees of Spring Hill Coll. in City of Mobile*, 978 F.2d 1214, 1223 (11th Cir. 1992).

Moreover, even if Terri had timely requested the instruction she seeks on appeal, that instruction would have been an incorrect statement of the law. As this case demonstrates, it is not necessarily accurate to say that a defendant will be liable for statutory damages if a violation of the SCA is found. Nor is it a correct

45

statement of law that statutory damages will be calculated based on the number of violations found, since, at most, a plaintiff may receive $1,000 in statutory damages, no matter how many violations may have occurred. *See supra* at Section II.B.2. Under these circumstances, it would have been error for the district court to have given the instruction Terri seeks on appeal. *See United States v. Hill*, 643 F.3d 807, 850 (11th Cir. 2011).

## D.

Next, we turn to Vista's claim that the district court should have awarded it punitive damages, despite the jury's verdict declining to do so. In support of this position, Vista appears to assert that the district court somehow devalued the jury's finding of 450 violations by failing to award punitive damages. Ironically, though, awarding punitive damages would have directly conflicted with the jury's express finding that $0 in punitive damages should be awarded to Vista, despite the number of violations that the jury found.

Vista cites no law supporting its contention that it was entitled to an award of punitive damages in the face of a jury verdict denying it just that. Instead, Vista refers to the language of the statute to argue that "punitive damages should have been awarded." But the SCA makes the award of punitive damages entirely discretionary: "If the violation is willful or intentional, the court *__may__* assess punitive damages." 18 U.S.C. § 2707(c) (emphasis added). We have observed in

other contexts that "[a]lthough . . . the mere use of 'may' is not necessarily conclusive of congressional intent to provide for a permissive or discretionary authority, . . . when Congress has intended mandatory action, it has used the word 'shall' to convey that intent." *Usmani v. U.S. Att'y Gen.*, 483 F.3d 1147, 1151 (11th Cir. 2007) (internal quotation marks and citations omitted). We have also specifically concluded that the use of "may" in the contemporaneously enacted Wiretap Act's damages provision is discretionary. *See DIRECTV, Inc. v. Brown*, 371 F.3d 814, 817-18 (11th Cir. 2004) (per curiam) (noting that the 1986 amendments to the Wiretap Act changed the mandatory term "shall" in the damages provision to "may," "which suggests that Congress intended an award of damages to be discretionary").

Where, as here, the imposition of punitive damages is entirely discretionary, the Seventh Amendment precludes a court from increasing the jury's award. *Millenium Partners, L.P. v. Colmar Storage, LLC*, 494 F.3d 1293, 1303 (11th Cir. 2007) (citing *Dimick v. Schiedt*, 293 U.S. 474, 55 S. Ct. 296 (1935)). As a result, the district court correctly declined to award Vista punitive damages, since the jury returned a verdict for $0 in punitive damages.

### E.

Our final consideration involving the SCA concerns the matter of attorney's fees. The operative statutory language again comes from § 2707(c): "In the case

47

of a successful action to enforce liability under this section, the court may assess the costs of the action, together with reasonable attorney fees determined by the court." As with the award of punitive damages, the statutory language—again employing the word "may"—makes an award of attorney's fees discretionary, not mandatory, in a "successful action."

We may reverse a district court's decision to deny attorney's fees only if we find that the district court abused its discretion. *See Smith v. Psychiatric Sols., Inc.*, 750 F.3d 1253, 1259 (11th Cir. 2014). A district court abuses its discretion if it does not apply the correct legal standard, or it fails to follow proper procedures in making the determination, or it bases an award or the denial of an award upon findings of fact that are clearly erroneous. *See In re Hillsborough Corp.*, 127 F.3d 1398, 1401 (11th Cir. 1997). We find no abuse of discretion in the district court's denial of attorney's fees in this case.

First, we agree with the district court's implicit conclusion that Vista successfully enforced liability in this action. As we have explained, liability under the SCA is a concept distinct from whether a person is "entitled to recover" actual damages or a violator's profits. In this case, the jury returned a verdict finding that Terri violated the SCA 450 times and that she did so intentionally or willfully. That is enough to successfully "enforce liability" under the SCA.

But that does not end the inquiry since the SCA makes the award of attorney's fees discretionary.  Here, the district court explained its denial of fees as follows:

> The jury's verdict makes clear that the jury did not believe that Vista was entitled to any actual or punitive damages.  Indeed, it is entirely unclear how *Vista* was damaged.  The e-mails that Terri accessed would have been discoverable in the divorce proceeding.  In other words, she was entitled to read these e-mails in the divorce proceeding because they involved Vista's operations.  Only one e-mail was privileged.  Franklin, at some point, was aware of Terri's access to the subject e-mail account but chose to allow Terri to continue her access so that he could devise a fake e-mail between himself and his attorney.  This conduct does not reveal any great concern on Vista's part with Terri's unauthorized access of the account.
>
> In sum, it is evident that this case is really between Franklin, a non-party, and Terri.  And it is being driven by emotions and, perhaps, personal vendetta.  It is also important to note that the 450 violations found by the jury can be construed as a single violation because Terri accessed the same e-mail account so frequently as to constitute one continuing violation.

 (emphasis in original).  This statement satisfactorily articulates the district court's reasons for its decision not to award attorney's fees in this case.

Vista asserts that it was error for the district court to consider as one continuing violation the 450 violations that the jury found.  Even assuming that it was, in this case, the error was harmless.  The single-violation rationale was but one of several reasons for the district court's decision not to impose attorney's

49

fees.  It is clear that the district court primarily relied on its observations that Vista had not demonstrated that it was harmed in any way and that the entire case appeared to be not an action to vindicate Vista's rights but instead a weapon to execute Franklin's "vendetta" against Terri.  Having sat through the trial, the district judge was in the best position to observe the demeanor of the parties and the witnesses.  Not only that, but the record amply supports the district judge's findings.  And Franklin points to no evidence to contradict the district judge's conclusions.

Vista also argues that policy considerations favor an award of attorney's fees in this case.  It contends that plaintiffs should not be reluctant enforce their rights under the SCA because the cost of representation may render them worse off even if they are successful in securing a jury verdict.  Usually, we would find this point to have force.  But where, as here, litigation seems motivated by vindictiveness (as opposed to a *bona fide* desire to enforce rights), it is unlikely that the availability (or lack thereof) of attorney's fees upon a successful action to enforce liability would factor into a plaintiff's determination of whether to bring a lawsuit under the SCA (other than as a consideration of a further way to inflict punishment on the defendant).  We certainly respect litigants' *bona fide* efforts to enforce their rights, but that does not seem to be what this case was ever about.  And we do not find

fault in the district court's discouragement of use of the courts as a weapon of spite.

Besides the considerations that the district court invoked, we also note that Terri sought legal counsel concerning accessing Vista's emails, and her attorney advised her that she could lawfully review them and even instructed her to print and keep them. Under these circumstances, we fail to see how an award of attorney's fees could serve as a deterrent to others. In short, we cannot say that the district court abused its discretion in declining to award Vista fees.

### III.

Finally, we address the evidentiary issues that Terri raises in her cross-appeal. Terri challenges two evidentiary rulings: (1) the exclusion of the divorce court's final judgment and factual findings; and (2) the denial of Terri's motion *in limine* and the related admission of evidence regarding the technical functioning of Vista's email system.

We review the district court's evidentiary rulings for abuse of discretion. *See Conroy v. Abraham Chevrolet-Tampa, Inc.*, 375 F.3d 1228, 1232 (11th Cir. 2004). Under this standard, we affirm the rulings of the district court unless the court "made a clear error of judgment, or . . . applied an incorrect legal standard." *Id.* But even then, the challenging party must establish that the error affected substantial rights to obtain reversal and a new trial. *See Piamba Cortes v. Am.*

51

*Airlines, Inc.*, 177 F.3d 1272, 1305 (11th Cir. 1999); *see also* 28 U.S.C. § 2111 ("On the hearing of any appeal . . . in any case, the court shall give judgment after an examination of the record without regard to errors or defects which do not affect the substantial rights of the parties."). Here, we find no reversible error.

### A.

Terri first objects to the district court's decision precluding admission of the divorce court's final judgment and testimony relating to the final judgment. She notes that Vista introduced evidence that Terri was neither involved in nor an owner of Vista in support of Vista's contention that Terri was not authorized to access Franklin's Vista account. In view of this evidence, Terri asserts, she should have been able to present the final judgment and related evidence of the divorce court's findings that Terri had previously been involved with Vista and that she was an owner of Vista.

The district court excluded the evidence solely on the basis that it was irrelevant. While we disagree that the evidence was irrelevant, we do not find reversible error.

Vista alleged that Terri violated the SCA by accessing Vista's email account "without authorization." And, in fact, "intentionally access[ing] ***without authorization*** a facility through which an electronic communication service is

provided" is part of an alternative element for establishing liability under the SCA. *See* 18 U.S.C. § 2701(a)(1).

The final judgment concluded that Terri was an owner of Vista. Terri's status as an owner of Vista, in turn, tends to make it more probable that she was authorized to access Vista's email account. As a result, the evidence satisfies the test for relevant evidence set forth in Rule 401, Fed. R. Evid.: "Evidence is relevant if: (1) it has any tendency to make a fact more or less probable than it would be without the evidence; and (b) the fact is of consequence in determining the action."

But that is not the end of the inquiry because we may affirm for any reason supported by the record, regardless of whether the district court relied on it. *See Am. United Life Ins. Co. v. Martinez*, 480 F.3d 1043, 1059 (11th Cir. 2007). In addition to being relevant, evidence must also be otherwise admissible. Here, Franklin contends that the final judgment is inadmissible hearsay to which no exception applies. *See United States v. Jones*, 29 F.3d 1549, 1554 (11th Cir. 1994). For her part, Terri responds that the final judgment is admissible under Rules 803(14) and (15), Fed. R. Evid., as records of documents that affect an interest in property.

We need not resolve this issue. Even assuming without deciding that the evidence was admissible, Terri has not shown that failure to admit the judgment

substantially prejudiced her case.  Although the district judge ruled that he would not allow Terri to admit the divorce judgment to prove she was an owner of Vista, ultimately, he effectively allowed the equivalent evidence, anyway.  In this regard, Terri's divorce attorney, Park, took the stand and attested to his belief that Terri was an owner of Vista and specifically that the divorce court had found her to be an owner of the company.[16]  The district court then instructed the jury that "what the judge did in the final judgment of a divorce in determining whether something is a marital asset is not dispositive of the issue of who the owners of the business were."  Put simply, evidence of the divorce court's finding that Terri was an owner of Vista was squarely before the jury.  Terri can show no substantial prejudice from the district court's decision not to enter the paper document evidencing the same thing.

## B.

Terri also challenges the district court's denial of her motion *in limine* to preclude Vista from offering the testimony of Jeff Gjoen and William Somma.  In

---

[16] Besides this evidence, Terri testified that she was an owner of Vista and was authorized to access the emails.  Among other points, Terri stated that she had a marketing degree, that she assisted Franklin in the formation of the company, that she and Franklin discussed investing their funds to start the business, that she helped find office space and furnished the office, that she wrote marketing scripts used in sales calls, and that, "as an owner," she received distributions with her name on them.  Terri also testified that Franklin had provided her with the password to the Vista email account in 2000, and she gave details surrounding the circumstances of that event.  In addition, Terri explained that she had relied on the advice of her divorce attorney, who had told her that Vista was a marital asset, in accessing and printing the emails.

54

her motion, Terri asserted that, at trial, Vista should not be permitted to present evidence of how Vista's email functions (and of whether, as a matter of fact, the emails Terri accessed were electronic communications in electronic storage provided by an electronic communication service, as those terms are defined by the SCA) because Vista's Rule 30(b)(6), Fed. R. Civ. P., deposition witness—Franklin—denied knowledge of these matters and did not indicate that another individual had that information. The district court denied the motion without explanation.

We do not find an abuse of discretion. While Terri suggests that she was "ambushed" with the testimony of Gjoen and Somma at trial, the record belies her contention. As early as in Vista's Rule 26 initial disclosures, Vista disclosed that both men were likely to have discoverable information. The initial disclosures further specified that Somma was then the "Current IT Specialist for Vista" and that Gjoen was the "Prior IT tech who created Frank Burkett's personal web account."

By the time of the Rule 30(b)(6) deposition, Vista had closed, and neither Somma nor Gjoen were employed by the company. As a result, Franklin testified, he was the only person available to act as the Rule 30(b)(6) representative. But Franklin did direct Terri to the people who had the information about Vista's email system. Franklin testified that Somma was Vista's former IT director and that he

55

was possibly the person to speak with regarding Vista's email retention policy, as well as its server and equipment. He added that Gjoen had initially established Vista's email procedures. At the end of Terri's deposition, Terri's counsel recognized that Somma was "[d]efinitely . . . going to be the guy we need to talk to on a lot of things about [the email]." Despite these facts, Terri did not take the depositions of Somma or Gjoen. Under these circumstances, we do not find that the district court abused its discretion in denying Terri's motion *in limine*.

## IV.

For the reasons we have described, we affirm the district court's denial of Terri's motion for judgment as a matter of law, jury instructions, denial of an award of attorney's fees, trial ruling precluding admission of the divorce court's final judgment, and denial of Terri's motion *in limine*. We vacate the district court's award of statutory damages to Franklin.

**AFFIRMED IN PART; VACATED IN PART.**

FAY, Circuit Judge, concurring specially:

I concur in the portion of Judge Rosenbaum's opinion that affirms the following decisions of the trial judge: denying Terri Burkett's motion for judgment as a matter of law under Federal Rule of Civil Procedure 50(b), her challenges to Jury Instruction No. 8 and Jury Instruction No. 9, attorney's fees, Burkett's motion *in limine*, and precluding admission of the final judgment of the divorce court, all of which are governed by settled precedent. Judge Rosenbaum's opinion, however, primarily is devoted to interpreting for this circuit the damages section of the Stored Communications Act ("SCA"), 18 U.S.C. § 2707(c). Because I disagree with her analysis, I write separately.

This case is controlled by *Doe v. Chao*, 540 U.S. 614, 124 S. Ct. 1204 (2004), and *Fanin v. U.S. Dep't of Veterans Affairs*, 572 F.3d 868 (11th Cir. 2009). The wording of the SCA damages section is so close to that of the Privacy Act, 5 U.S.C. § 552a(g)(4), I conclude we are bound by the holdings of those cases. No damages are available to one bringing an action under either Act unless actual damages are proved. Actual damages "means pecuniary losses." *Fanin*, 572 F.3d at 872. These holdings resolve this case. In my opinion, there is simply no need to delve into legislative history or the analyses of non-binding case law.[1]

---

[1] Regarding legislative history, the *Doe* Court noted relative to the Privacy Act that "[t]hose of us who look to legislative history have been wary about expecting to find reliable interpretive help

57

The jury decided that, although there were multiple violations of the SCA, there were no damages whatsoever—compensatory or punitive. Jury verdicts are not "overturned unless no rational trier of fact could have reached the same conclusion based upon the evidence in the record." *Nat'l Fire Ins. Co. of Hartford v. Fortune Constr. Co.*, 320 F.3d 1260, 1267 (11th Cir. 2003). "Neither the district courts nor the appellate courts are free to reweigh the evidence and substitute their judgment for that of the jury." *Castle v. Sangamo Weston, Inc.*, 837 F.2d 1550, 1559 (11th Cir. 1988). I would reverse the district judge's judgment awarding $50,000 in statutory damages to Vista and remand with instructions to reinstate the jury's verdict and enter judgment accordingly.[2]

---

*outside the record of the statute being construed.*" *Doe*, 540 U.S. at 626, 124 S. Ct. at 1212 (emphasis added).

[2] In his order awarding Vista $50,000 in statutory damages, the district judge acknowledged: "The jury's verdict makes clear that *the jury did not believe Vista was entitled to any actual or punitive damages.* Indeed, *it is entirely unclear how Vista was damaged.*" Order & J. on Damages at 12 (emphasis added).

58