[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

_____

No. 18-13321

_____

D.C. Docket No. 1:15-cr-00022-LMM-JFK-2

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

versus

WILLIAM A. GOLDSTEIN,
MARC BERCOON,

Defendants-Appellants.

_____

Appeals from the United States District Court
for the Northern District of Georgia

_____

(February 26, 2021)

Before WILSON, BRANCH, and JULIE CARNES, Circuit Judges.

JULIE CARNES, Circuit Judge:

Defendants William Goldstein and Marc Bercoon found themselves facing a 19-count indictment for conspiracy, mail fraud, wire fraud, securities fraud, and money laundering after profiting handsomely from a market-manipulation scheme involving shares of MedCareers Group, Inc. ("MCGI") and a scheme to defraud investors in Find.com Acquisition, Inc. ("Find.com").  The 19 counts were whittled down to 13 during the course of the proceedings.  After a ten-day trial, a jury found Defendants guilty on 12 of the 13 counts, acquitting Defendants on the one remaining charge of money laundering but convicting them on two counts of conspiracy, two counts of mail fraud, seven counts of wire fraud, and one count of securities fraud.

Defendants now appeal their convictions, arguing that the district court erred in (1) denying their motions to suppress evidence obtained from wiretaps, (2) denying an evidentiary hearing concerning alleged omissions from a wiretap affidavit, (3) ruling that the trial evidence did not materially vary from the indictment, and (4) entering a $1.9 million forfeiture order against both Defendants.  Separately, Defendant Bercoon argues that the Government engaged in prosecutorial misconduct by mischaracterizing the evidence during closing arguments, as well as before the grand jury.  And Defendant Goldstein argues that the district court erred (1) in denying his motion to suppress statements he made during an informal telephone interview with an attorney from the Securities and

2

Exchange Commission ("SEC") and (2) in denying an evidentiary hearing as to whether the SEC's civil investigation and the U.S. Attorney's criminal investigation improperly merged. We find Defendants' arguments unpersuasive and affirm the decisions below.

## I.    BACKGROUND

Defendants' convictions arise from two fraud schemes. The first was a "pump and dump" market-manipulation operation in March and May of 2010, which involved MCGI's publicly traded stock. Defendants executed a plan to artificially inflate the price of MCGI stock (i.e., "pump" the stock) by obtaining control of shares, promoting the stock with mass emails and misleading press releases, and making numerous small trades to generate interest. Then, Defendants profited by selling the artificially inflated shares (i.e., by "dumping" the stock). The second scheme involved a plan to sell shares of the privately traded company Find.com via misleading and fraudulent representations. Defendants provided potential investors with written materials—including a "Confidential Investor Information" sheet and a "Confidential Private Placement Memorandum"—falsely stating that five million shares of Find.com were being offered at $1.00 per share and that the proceeds (minus a selling commission of 12.5 cents per share) would be reinvested in the business. In fact, however, shares of Find.com had been sold for less than $1.00 each, sales commissions were higher than 12.5 cents per share,

3

and Defendants used the investment proceeds for their own benefit rather than investing them in the business.

## A.    The SEC's Investigation and Interview of Goldstein

The Atlanta SEC office started investigating Defendants' manipulative trades of MCGI stock in the spring of 2010. On June 30, 2010, Atlanta SEC attorney Natalie Brunson called Goldstein for an informal interview in connection with the investigation. By the time of trial in this case, Brunson no longer recalled her discussion with Goldstein, but her notes regarding the conversation reflected that Goldstein said he had received no compensation or shares from MCGI and he did not know whether Peter Veugeler, a co-conspirator in the MCGI scheme, was associated with MCGI.[1] Testimony at trial showed that Goldstein's statements were untrue.

After the June 30 call, Brunson sent Goldstein a follow-up letter enclosing a copy of SEC Form 1662. The letter thanked Goldstein for "taking time today to speak . . . voluntarily, about [his] relationship with [MCGI]" and stated, "As I explained, this inquiry is nonpublic and confidential." Form 1662 provided information about a witness's rights, including the right to refuse to speak to the SEC, the right to contact an attorney, and the penalties for providing false

---

[1] Veugeler was originally charged as a participant in the MCGI stock manipulation scheme, but he pled guilty and testified against Goldstein and Bercoon at trial.

information.  It also provided information about the routine uses of information gathered by the SEC during an informal investigation, stating that the SEC "often makes its files available to other governmental agencies, particularly United States Attorneys," and that information supplied by a witness "will be made available to such agencies where appropriate."

## B.    The FBI's Investigation and Wiretap Affidavits

Brunson shared her notes with the Atlanta U.S. Attorney's Office, which began a criminal investigation into the MCGI scheme in August 2010.  Two confidential sources, CS-1 (Marc Rosenberg) and CS-2 (Alan Weiner), provided the FBI information during the initial investigation.[2]  Rosenberg was Goldstein's personal assistant and worked for Goldstein and Bercoon for many years prior to the MCGI scheme.  He told FBI agents that Bercoon had instructed him to open brokerage accounts to trade MCGI stock and to open a bank account in the name of HMRZ Consulting, LLC ("HMRZ").  Defendants controlled the trading in Rosenberg's brokerage accounts, and they transferred proceeds from the sale of MCGI stock into the HMRZ bank account and their personal bank accounts.

In July 2010, Rosenberg discovered that he had incurred a substantial tax liability as a result of Defendants using his brokerage accounts to execute MCGI trades.  Shortly thereafter, he retained a lawyer and agreed to cooperate with the

---

[2]  Rosenberg and Weiner testified against Defendants at trial.

FBI in the MCGI investigation. In recorded phone conversations in February, April, and May 2011, Rosenberg told Bercoon about his tax liability, and Bercoon tacitly acknowledged both that Defendants had used Rosenberg's accounts to trade MCGI stock and that they were responsible for Rosenberg's taxes.

CS-2 (Weiner) began working for Goldstein in 2009. In the summer of 2009, Weiner traveled to Florida with Goldstein to meet David and Donna Levy, two well-known stock promoters.[3] Weiner reported that after this meeting, and on the advice of David Levy, Goldstein purchased a shell company that became MCGI. David Levy then introduced Goldstein to Peter Veugeler to promote MCGI's launch and used third party Eric Cusimano[4] to send email blasts to thousands of potential investors.

Weiner traveled with Goldstein to Florida to meet Veugeler in March 2010. During this trip, and with Weiner present, Goldstein and Veugeler spent several days trading MCGI stock, with Goldstein using Rosenberg's brokerage accounts. Weiner again accompanied Goldstein to meet Veugeler in Florida in May 2010, when the two traded MCGI stock a second time. This time, Veugeler told Weiner and Goldstein that, earlier that day, he had been served with an SEC civil

---

[3] Donna Levy was under indictment in New York for fraud and money laundering when she met with Goldstein and Weiner.

[4] Cusimano is another co-conspirator who pled guilty and testified against Defendants at trial.

complaint alleging market manipulation in a similar but unrelated scheme. Nevertheless, Goldstein and Veugeler proceeded to trade MCGI stock, coordinating their trades with Levy and Cusimano's press releases and marketing emails.

In addition to the information that Rosenberg and Weiner provided, the FBI obtained data from the SEC that showed the trading volume and price of MCGI shares between January 25, 2010 and April 8, 2011. The FBI's analysis of the data corroborated the information provided by Rosenberg and Weiner concerning the March and May 2010 market manipulations.

Finally, the FBI obtained information suggesting that Defendants engaged in another market manipulation of MCGI stock in late March 2011. On March 28, 2011, Hotstocked.com, a Bulgarian website that reported on penny stock manipulations, announced that MCGI was starting a new promotional campaign. Trading data during the relevant timeframe corroborated this reporting, showing that on March 28, 2011 MCGI's price increased by 108% and its trading volume increased by more than 8,000%. The reporting was further corroborated by telephone records showing a high volume of contacts between Goldstein, Bercoon, and Veugeler during the last week of March 2011, as well as numerous contacts around the same time between Goldstein and Gerard Adams, the target of another SEC "pump and dump" investigation.

7

After gathering the above information, the Government applied for and obtained four Title III wiretap orders authorizing agents to intercept calls on phones used by Bercoon and Veugeler. The orders were dated June 24, July 26, August 25, and October 3, 2011. Special Agent R. Wallace Taylor, Jr. submitted affidavits in support of the wiretap applications, and each application was granted by a different district court judge.

Agent Taylor's affidavit in support of the June 24, 2011 wiretap application explained that the FBI was investigating Bercoon, Goldstein, Veugeler, and others for participating in a market-manipulation conspiracy involving MCGI stock. Taylor disclosed in the affidavit that the facts asserted therein were based in part on the SEC's ongoing civil investigation of the market manipulation, including trading data provided by the SEC, and that the FBI and the SEC had "participated in joint interviews with cooperating witnesses." He also referenced a civil suit filed by the SEC against Bercoon and Goldstein in Los Angeles, which concerned a different stock fraud related to the company LADP Acquisitions, Inc. ("LADP").

Taylor asserted in the affidavit that there was probable cause to believe the wiretap requested by the Government would uncover critical facts concerning the MCGI market manipulation conspiracy, including information about its scope, its participants, and the distribution and location of proceeds. In support of that assertion, he described in detail the evidence set out above, including the

8

information provided by CS-1 (Rosenberg) and CS-2 (Weiner), the corroborating MCGI trading data and phone records, and the reporting by Hotstocked.com suggesting that the conspiracy was "still ongoing" and that another market manipulation had occurred in March 2011.

In the necessity section of the affidavit, Taylor argued that a wiretap was necessary because other investigative techniques were not likely to succeed in accomplishing all the objectives of the investigation, including identifying all the co-conspirators and uncovering the contents of their conversations. Specifically, Taylor stated that surveillance was of limited value in revealing the substance of relevant conversations and that an undercover agent would not likely obtain any useful information because Defendants were hesitant to work with people they did not know. Taylor acknowledged that confidential informants and financial records had provided useful historical information, but he noted that CS-1 (Rosenberg) and CS-2 (Weiner) no longer worked with or were trusted by Defendants and that financial records could only provide information about past events. Taylor stated further that the use of interviews, grand jury subpoenas, and search warrants would not identify all the co-conspirators or reveal the full scope of their criminal activity and would likely hamper the investigation by alerting targets to the investigation.

Based on the information provided in Taylor's June 24 affidavit, the district court granted the Government's Title III wiretap application. Different district

court judges granted the follow-on wiretap applications filed on July 26, August 25, and October 3, which were supported by materially similar affidavits supplemented with new information about the content of incriminatory calls intercepted pursuant to the June 24 order.  As evident from the July 26 and August 25 affidavits, the wiretaps uncovered evidence of the MCGI manipulations that occurred in March and May 2010 and of additional planned manipulations.  For example, in four calls between June 29 and July 19, 2011, Bercoon and an individual with the initials T.A. discussed bringing SEC filings current, issuing press releases, and raising money from another MCGI manipulation.  And on August 16, 2011, Veugeler and Bercoon discussed a market manipulation of another stock, GNZR.

### C.    Indictment and Pretrial Motions

Following the investigation, Defendants were indicted on 19 counts of conspiracy, mail fraud, wire fraud, securities fraud, and money laundering related to the MCGI and Find.com schemes.  Six of the counts were dismissed before or during trial, leaving 13 counts against Defendants in the indictment.  As to Find.com, the indictment alleged that Goldstein and Bercoon had conspired to defraud investors in the company by distributing written offering materials that contained misrepresentations concerning the share price, commission rates, and how investment proceeds would be used.  With regard to MCGI, the indictment

alleged that Goldstein and Bercoon had engaged in a "pump and dump" scheme with co-conspirator Veugeler in March and May 2010, whereby Defendants gained control of MCGI shares, artificially inflated their prices, and then sold them for large profits.

Prior to trial, Defendants moved to suppress the wiretap recordings, arguing that Agent Taylor's affidavits failed to establish probable cause or necessity. Defendants also asked the district court for a hearing under *Franks v. Delaware*, 438 U.S. 154 (1978) to determine whether Taylor's wiretap affidavit included statements that were deliberately false or made with reckless disregard for the truth, given that the affidavit did not discuss records obtained by the Los Angeles SEC office in connection with the pending LADP litigation. The Government opposed Defendant's motions and argued that the good-faith exception to the exclusionary rule would apply even if the district court had erred in issuing the wiretap orders.

The magistrate judge recommended denying the motion to suppress and the motion for a *Franks* hearing, concluding that Taylor's wiretap affidavits established probable cause and necessity, that the good-faith exception to the exclusionary rule applied in any event, and that Defendants had not shown a *Franks* hearing was warranted. The district court agreed and adopted that recommendation.

11

In addition to the wiretap motions, Goldstein filed a motion requesting (1) the production of communications between the Atlanta SEC office and the U.S. Attorney and (2) an evidentiary hearing as to whether the SEC's civil investigation and the U.S. Attorney's criminal investigation had unfairly merged. The magistrate judge ordered the Government to produce the requested communications for *in camera* review, but she ultimately recommended denying Goldstein's motion, concluding that he had failed to allege any facts that placed the legitimacy of the parallel civil and criminal investigations in question. The district court agreed after conducting its own *in camera* review of the communications requested by Goldstein.

Finally, Goldstein filed a motion to suppress the statements he made to SEC attorney Brunson during her informal interview in June 2010. The magistrate judge held an evidentiary hearing on the motion, during which Brunson testified that it was her practice to recite the SEC's "Privacy Act script" before interviewing any witness who is not under subpoena. Brunson stated further that it is SEC procedure and her practice to send a form letter along with a copy of Form 1662 to a witness after an initial call. As described above, the form letter in Brunson's file on Goldstein stated, "Thank you for taking time to speak with me, voluntarily, about your relationship with [MCGI]. . . . As I explained this inquiry is nonpublic and confidential." Brunson testified that she did not typically address what it

means for the inquiry to be "nonpublic and confidential" other than to explain, if asked, that she would appreciate it if the witness did not speak with anyone else about the discussion.

Crediting Brunson's testimony, the magistrate judge found that Brunson had read the Privacy Act script to Goldstein before speaking with him. The magistrate judge therefore concluded that, under the totality of the circumstances, Goldstein voluntarily agreed to the interview after being advised that the information could be used by the SEC and other authorities to determine if there had been legal violations. To the extent the phrase "nonpublic and confidential" was discussed, the magistrate judge found that Brunson might have asked Goldstein not to speak with anyone else about the investigation, but that she had not misled Goldstein or promised that the information he provided would not be used against him. The district court adopted the magistrate judge's ruling.

### D.    Trial

At trial, the Government presented overwhelming evidence that Defendants had orchestrated the MCGI market manipulation and misled investors in Find.com. Rosenberg explained that, following Defendants' instructions, he had set up brokerage accounts and the HMRZ account to allow Defendants to trade MCGI stock and receive the proceeds. Weiner described traveling to Florida with Goldstein to meet Levy, who gave Goldstein step-by-step instructions for

13

conducting a market manipulation and introduced Goldstein to Veugeler. Veugeler testified that he had helped Goldstein purchase the shell company that eventually became MCGI and explained that he was responsible for acquiring the free-trading shares of MCGI stock, creating a demand for the shares via marketing, and selling the stock at an artificially inflated price in March and May 2010. Weiner described how Goldstein had used a throw-away phone to relay trading instructions to Bercoon and how Goldstein, Bercoon, and Levy had worked together to draft and time misleading press releases to coincide with the trading. Cusimano added that Veugeler had paid him $250,000 to promote MCGI in March and May 2010 via email blasts to subscribers of his website, bestdamnpennystocks.com. According to Veugeler, he and Goldstein raised approximately $1.6 million from the first transaction, $440,000 of which was paid back to investors with the rest split between Veugeler, Cusimano, Levy, and MCGI. Rosenberg also related that Bercoon had tacitly acknowledged that he and Goldstein were responsible for paying the tax liability Rosenberg incurred as a result of the MCGI trades in his brokerage accounts.

The Government entered 17 wiretap recordings into evidence in connection with testimony from FBI Special Agent Cromer. On August 15, 2011, Cromer visited Goldstein's house, where he informed Goldstein that the FBI was investigating unusual trading activity in MCGI stock and that there was an

14

opportunity for Goldstein to cooperate against bigger targets.  After Agent

Cromer's visit, several recorded calls between Goldstein and Bercoon captured

them discussing the FBI's attempt to have them "roll over" on the "bigger fish."

On the recordings, Defendants acknowledged their role in the MCGI market

manipulation, referring to the scheme as a "victimless crime" and stating that they

"stole . . . from the market."

To prove the misrepresentations made in connection with the Find.com

scheme, the Government introduced the offering documents used to solicit

investors, which represented that the price was $1.00 per share, that the company

would pay sales commissions of 12.5%, and that the proceeds would be reinvested

into the business.  Weiner testified that these representations were false, as

Defendants sold Find.com stock at less than $1.00 per share, paid sales personnel

30–40% commissions, and did not reinvest the investment proceeds into the

business.

The offering documents also contained false information about a woman

named Cynthia White, who was affiliated with the company Scientigo, Inc., which

had sold the Find.com URL to Goldstein and Bercoon.  White testified that the

description of Scientigo in the Find.com offering documents inaccurately listed her

as a member of the board of managers for Find.com and that the documents were

otherwise outdated and misleading.  In addition, the offering documents contained

15

false statements about the technology Find.com hoped to develop or acquire, including an anti-spyware program and a mobile search engine. Weiner testified that Find.com did not have anti-spyware technology, and Konstantin Derenstein, one of the main technology developers at Find.com, testified that he was never asked to develop anti-spyware software or a mobile search engine. Although Defendants objected to the testimony of White, Derenstein, and Weiner, arguing that it created a material variance between the misrepresentations alleged in the indictment and the evidence presented at trial, the court overruled their objections.

SEC attorney Brunson testified that, during her June 2010 call with Goldstein, he had told her that he did not receive any shares or compensation from MCGI, and that he did not know whether Veugeler was associated with MCGI. According to Veugeler's testimony, however, those statements were untrue. Addressing the Privacy Act script issue, Brunson testified that SEC personnel are required to read the script before speaking to a witness. She acknowledged that attorneys do not read the script word for word in every instance but said they always "hit the high notes," addressing the witness's rights and how the SEC might use any information provided. Brunson said she always told the witness that it was a voluntary decision to speak with her, that the witness could consult an attorney, and that the information provided by the witness might be shared with other agencies.

16

Brunson further testified that she had notified the U.S. Attorney's Office and paused the civil investigation to allow the criminal investigation to proceed after an attorney for Rosenberg and Weiner had contacted her to report the MCGI market manipulations in the summer of 2010. Weiner clarified that he and Rosenberg had hired attorneys and contacted law enforcement after witnessing the market manipulations in March and May 2010. By contrast, Weiner and Veugeler testified that Goldstein had continued working with Veugeler even after being informed that the SEC had sued Veugeler for securities fraud based on a prior market manipulation. And the wiretap showed that Bercoon had continued conspiring with Veugeler to commit another market manipulation even after being informed that the FBI was investigating them for securities fraud.

The Government's financial evidence showed that Defendants' schemes generated millions of dollars in proceeds. Trading data showed that Veugeler's and Rosenberg's accounts owned 100% of the MCGI free-trading shares before the March and May 2010 manipulations, that the conspirators executed a series of small trades during the relevant timeframe to give the stock an appearance of activity, and that price and trading-volume spikes in MCGI stock followed. Financial records established that numerous accounts controlled by Veugeler and Rosenberg raised net proceeds of over $2.5 million from the MCGI manipulations. As to the Find.com scheme, an FBI forensic analysis revealed that 84 individuals

17

had invested about $1.5 million in Find.com, and that Defendants had withdrawn over $550,000 of the proceeds in cash and transferred another $500,000 to the HMRZ account.

### E.    Conviction and Sentencing

The jury convicted Defendants on 12 of the 13 remaining counts, including two counts of conspiracy, two counts of mail fraud, seven counts of wire fraud, and one count of securities fraud.[5]  The district court sentenced Defendants to ten years and ordered each to pay restitution in the amount of approximately $1.5 million. Finding that Defendants both had access to and control over all the accounts containing the fraud proceeds, the court imposed a forfeiture order against each defendant for the total amount of the proceeds:  approximately $1.9 million.  The court specified, however, that the Government could not recover more than the total of $1.9 million from Defendants under the forfeiture order.

## II.    DISCUSSION

On appeal, Defendants jointly challenge the district court's admission of wiretap evidence, its denial of a *Franks* hearing, its ruling that the trial evidence did not materially vary from the indictment, and its imposition of a $1.9 million forfeiture order against both Defendants.  Defendant Bercoon also argues that the Government engaged in prosecutorial misconduct by mischaracterizing the

---

[5]  The jury acquitted Goldstein and Bercoon of money laundering.

18

evidence during closing arguments, as well as before the grand jury. Defendant Goldstein separately challenges the court's denial of his motion to suppress his statements to SEC attorney Brunson during the preliminary interview and the denial of an evidentiary hearing regarding whether the civil and criminal investigations improperly merged. We conclude that none of these arguments warrant reversal.

### A.    Suppression of Wiretap Evidence

Evidence obtained by wiretap is subject to the Fourth Amendment's prohibition against unreasonable searches. *See Vista Mktg., LLC v. Burkett*, 812 F.3d 954, 970 (11th Cir. 2016) (noting that the Government must show "all that the Fourth Amendment itself requires" to obtain a wiretap). As such, a wiretap must be supported by the same probable cause necessary to obtain a search warrant. *See id.* Furthermore, a wiretap is statutorily required to be justified by a showing of necessity—a showing that "normal investigative procedures have been tried and have failed or reasonably appear to be unlikely to succeed if tried or to be too dangerous." 18 U.S.C. § 2518(3)(c). The necessity requirement ensures that "electronic surveillance is neither routinely employed nor used when less intrusive techniques will succeed." *United States v. Maxi*, 886 F.3d 1318, 1331 (11th Cir. 2018) (quotation marks omitted). "In evaluating whether the Government met its burden, courts must read supporting affidavits in a practical and commonsense

fashion, and the district court is clothed with broad discretion in its consideration of the application." *United States v. Hawkins*, 934 F.3d 1251, 1258 (11th Cir. 2019) (quotation marks omitted).

Defendants argue that Agent Taylor's affidavit submitted in support of the Government's June 24, 2011 wiretap application did not establish probable cause or satisfy the necessity requirement.[6] We apply a mixed standard of review to a district court's denial of a motion to suppress evidence obtained from a wiretap, reviewing findings of fact for clear error and conclusions of law *de novo*. *United States v. Emmanuel*, 565 F.3d 1324, 1330 (11th Cir. 2009). Under this standard, we review *de novo* whether a wiretap is supported by probable cause, *cf. United States v. Jiminez*, 224 F.3d 1243, 1248 (11th Cir. 2000), and we review the district court's necessity determination for clear error, *Maxi*, 886 F.3d at 1331.

### 1.    Probable Cause

The Government can establish probable cause for a wiretap with facts showing that (1) a crime is being, has been, or is about to be committed and (2) communications about the crime will be intercepted by the requested wiretap. *See* 18 U.S.C. § 2518(3)(a)–(b). Pertinent here, the facts must be "sufficiently close in time to the issuance [of the wiretap] . . . that probable cause can be said to

---

[6] Defendants do not separately address the subsequent wiretap affidavits submitted in July, August, and October 2011, but they argue that those affidavits rely on conversations recorded pursuant to the June 24 wiretap order to establish probable cause, and that evidence gathered under the later orders should thus be suppressed under the fruit-of-the-poisonous-tree doctrine.

20

exist as of the time of [the wiretap] and not simply as of some time in the past."
*See United States v. Grubbs*, 547 U.S. 90, 95 n.2 (2006) (quoting with approval
*United States v. Wagner*, 989 F.2d 69, 75 (2d Cir. 1993)); *see also United States v.
Bervaldi*, 226 F.3d 1256, 1264–65 (11th Cir. 2000) (explaining that the staleness
doctrine requires that probable cause exists when a wiretap is authorized).

Defendants concede that Agent Taylor's affidavit established probable cause
to believe unlawful market manipulations involving MCGI had occurred in March
and May of 2010. But according to Defendants, Taylor's affidavit failed to
establish probable cause to believe the market manipulations were continuing or
that any information about the past manipulations would be obtained via a wiretap
issued more than a year after the 2010 manipulations were completed. Thus,
Defendants argue, the probable cause established by Taylor's affidavit was stale by
the time the Government submitted its first wiretap application on June 24, 2011.

There is no arbitrary time limit after which information offered to support a
wiretap becomes stale. *See Bervaldi*, 226 F.3d at 1265. Rather, evaluating
staleness requires a fact-intensive inquiry based on the totality of the
circumstances, including the "nature of the suspected crime (discrete crimes or
ongoing conspiracy), habits of the accused, [and] character of the [information]
sought." *Id.* (quotation marks omitted). Depending on the circumstances, a valid

21

wiretap may issue after a crime is complete so long as there is probable cause that evidence of the completed crime will be found. *See id.*

Here, the magistrate judge did not err in concluding that the probable cause contained in Taylor's June 24, 2011 wiretap affidavit was not stale. First, Taylor's affidavit showed that Bercoon had used the phone targeted by the June 24 wiretap application to discuss the 2010 MCGI market-manipulation conspiracy as late as May 2011. In February, April, and May of 2011, Rosenberg recorded phone calls with Bercoon while cooperating with the FBI. In a February call, Rosenberg informed Bercoon that he was facing $83,000 in tax liability for the stock trades Bercoon and Goldstein had executed through Rosenberg's account in March and May 2010. Rather than denying his involvement in and responsibility for the MCGI trades that had generated Rosenberg's tax liability, Bercoon responded, "I'll have to meet you and sit down and take a look at it and I'll go through it with you." Bercoon further offered that "I have a legitimate way to deal with it." Nor did Bercoon deny his responsibility for the tax liability when Rosenberg expressed that he was "worried about this $83,000 y'all owe." Instead, Bercoon said "I understand." Bercoon continued to tacitly accept responsibility for Rosenberg's tax liability in an April call, where he advised Rosenberg to seek an extension of the tax filing deadline while he made necessary arrangements. In a May 2011 follow-up call, Rosenberg stressed the need for Bercoon to complete Rosenberg's

22

tax return, and Bercoon confirmed that he would do so, stating, "I'll work on it this morning" and "get on it this week." When Rosenberg expressed his "regret[]" for "letting [his] account be used," Bercoon tellingly replied, "I know, I know all this shit. I'm in the same fucking boat. . . . I'm trying to do what I can." Given Bercoon's implicit agreement as late as May 2011 that he was responsible for the tax liability generated by trades from Rosenberg's accounts, the magistrate judge reasonably concluded that fresh probable cause existed to believe evidence of the 2010 MCGI market manipulations would be obtained by wiretapping Bercoon's phone in June 2011, despite the remoteness in time from the manipulations themselves.

Further, Taylor's affidavit showed that another market manipulation involving MCGI had occurred in March 2011, indicating that the conspiracy was ongoing. As Taylor described, a report on the website Hotstocked.com announced that MCGI was the subject of an "internet promotional campaign" on March 27 and 28, 2011. The FBI verified that a few days prior to March 27, Goldstein called Gerard Adams, a stock promoter known for market manipulation and pump-and-dump conduct, and then immediately called Bercoon. Taylor identified 27 additional contacts between Goldstein and Adams during the last week of March 2011, as well as an unusually large number of contacts between Goldstein and Bercoon the same week. Further, SEC trading data showed that on March 28,

23

2011, MCGI's price increased 108% while its trading volume increased over 8,000%. Relying on Taylor's interpretation of this information based on his training and experience, the magistrate judge reasonably found that these facts supplied probable cause to believe the MCGI market manipulation conspiracy was ongoing until at least March 2011, further bolstering the likelihood that a June 2011 wiretap on Bercoon's phone would capture evidence of the conspiracy.

Defendants characterize the information concerning the March 2011 manipulation as mere speculation, noting that the FBI was not able to verify the Hotstocked.com website. Defendants also point out that internet promotion of a stock and corresponding increased trading could reflect lawful advertising rather than an illegal market manipulation. The same is true, Defendants argue, about the frequency of Goldstein's communications with Adams and Bercoon in March 2011, which Defendants contend could just as likely have pertained to a lawful internet promotion as to a market manipulation. These arguments, however, ignore the history and established pattern of the MCGI conspiracy, Adams's status as a known market manipulator, the timing of the Hotstocked.com reporting, and the suspicious trading data and contacts.

In short, the magistrate judge correctly found that the probable cause asserted in Taylor's June 24, 2011 wiretap affidavit was not stale under the totality of the circumstances, given Bercoon's recorded calls with Rosenberg in April and

24

May 2011 and the evidence suggesting that another MCGI manipulation had occurred in March 2011.  This conclusion stands in contrast with the cases cited by Defendants, which found the information supporting probable cause stale because it concerned temporally remote, discrete crimes.  *See United States v. Raymonda*, 780 F.3d 105, 116–17 (2d Cir. 2015) (holding that nine-month-old evidence of "a single incident of access" to child pornography did not provide probable cause for a warrant to search the suspect's home "absent any indicia that the suspect was a collector of child pornography"); *see also United States v. Wagner*, 989 F.2d 69, 74–75 (2d Cir. 1993) (invalidating a search warrant that depended on six-week-old evidence of a single purchase of marijuana in the absence of evidence suggesting an "ongoing drug-selling operation").  Unlike *Raymonda* and *Wagner*, the facts asserted in Taylor's June 24 affidavit suggested a conspiracy involving multiple episodes of criminal activity that continued over a period of time, with the latest incident occurring only a few months prior to the wiretap application.  *See Bervaldi*, 226 F.3d at 1265 (noting that probable cause might "quickly dwindle[]" if "an affidavit recites a mere isolated violation," but that "time is of less significance" when "an affidavit recites activity indicating protracted or continuous conduct" (quotation marks omitted)).

25

2.    Necessity

In addition to being supported by probable cause, a wiretap application must satisfy the necessity requirement by including a "full and complete statement" describing other investigative techniques that have been tried and failed or explaining why such other techniques are unlikely to succeed. *See* 18 U.S.C. § 2518(1)(c), (3)(c). A wiretap affidavit need not "show a comprehensive exhaustion of all possible techniques" to satisfy the necessity requirement. *United States v. Van Horn*, 789 F.2d 1492, 1496 (11th Cir. 1986). Instead, it simply must show why "investigative techniques that reasonably suggest themselves" have failed or would fail. *Id.* Furthermore, the "partial success of alternative investigative measures" does not foreclose the use of a wiretap. *United States v. Perez*, 661 F.3d 568, 581–82 (11th Cir. 2011).

Agent Taylor's June 24 affidavit clearly satisfied the necessity requirement. The affidavit included an 11-page section explaining in detail why the wiretap was needed to accomplish the investigation's objectives. It exhaustively described numerous investigative techniques that had been tried with only partial success or that would not likely succeed, including analyzing phone records, using confidential informants, surveillance, interviews, grand jury subpoenas, financial records, and search warrants. As Taylor explained, although some of these

26

techniques had uncovered useful historical information, a wiretap was needed to identify all the co-conspirators and reveal the full scope of the conspiracy.

Defendants argue that the wiretap was unnecessary because the Government had already obtained enough information from the SEC's investigation of MCGI, surveillance, phone records, and two confidential sources to convict Defendants. This is a somewhat odd position for Defendants to take, given that they aggressively challenged the sufficiency of the Government's evidence at trial, questioning the bias and veracity of the informants and arguing that the trading data was not consistent with market manipulations. In any event, the Government's showing of necessity was not defeated based on the mere possibility that the Government might have otherwise had enough evidence to sustain a conviction against Defendants for their past market manipulations of MCGI. Again, the Government's stated objective in the investigation here was to identify all the co-conspirators involved in the market-manipulation scheme and to determine the full scope of the conspiracy. Taylor's affidavit shows that the wiretap was necessary to meet this objective. *See Perez*, 661 F.3d at 582 (holding that, while the Government had enough evidence to prosecute one defendant before the wiretap, it need not end the investigation before learning the full extent of the defendant's criminal activities and identifying his co-conspirators); *United States v. Hyde*, 574 F.2d 856, 869 (5th Cir. 1978) (affirming necessity of wiretap,

noting that "[a]lthough the government has actual knowledge of a conspiracy and evidence sufficient to prosecute one of the conspirators, it is unrealistic to require the termination of an investigation before the entire scope of the [conspiracy] is uncovered and the identity of the participants learned" (quoting *United States v. Armocida*, 515 F.2d 29, 38 (3d Cir. 1975))).  And in fact, the Government identified new investigation targets from calls intercepted pursuant to the June 24, 2011 wiretap.

Finally, Defendants argue that the Government should have tried to obtain evidence from the LADP litigation pending in Los Angeles before seeking a wiretap.  According to Defendants, this evidence would have made the June 24, 2011 wiretap unnecessary.  Yet, Defendants have not shown that the magistrate judge clearly erred in rejecting this argument.  Indeed, Defendants do not even attempt to explain how the information produced in the LADP litigation would have uncovered the evidence the Government sought via the wiretap issued in this case, which involved a different company and a different fraud scheme.  *See United States v. Alonso*, 740 F.2d 862, 869 (11th Cir. 1984) ("The order will not be overturned simply because defense lawyers are able to suggest *post factum* some investigative technique that might have been used and was not." (quotation marks omitted)).

### 3.    Good Faith

Even assuming there was some deficiency in Taylor's June 24 affidavit, the district court held that the good-faith exception to the exclusionary rule applied to the wiretap evidence. The good-faith exception applies when "an officer has in good faith obtained a search warrant from a judge or magistrate and acted within its scope." *United States v. Travers*, 233 F.3d 1327, 1329 (11th Cir. 2000) (citing *United States v. Leon*, 468 U.S. 897, 920–21 (1984)). The exclusionary rule is designed to deter unlawful police conduct. *See United States v. Malekzadeh*, 855 F.2d 1492, 1497 (11th Cir. 1988). When law enforcement officers act in good faith and in reasonable reliance upon a judge's order, exclusion is not warranted because there is no unlawful conduct to deter. *Travers*, 233 F.3d at 1329.

There are four situations in which the good-faith exception does not apply: (1) where the issuing judge "was misled by information in an affidavit that the affiant knew was false or would have known was false except for his reckless disregard of the truth"; (2) "where the issuing magistrate wholly abandoned his judicial role"; (3) "where the affidavit supporting the warrant is so lacking in indicia of probable cause as to render official belief in its existence entirely unreasonable"; and (4) where "a warrant is so facially deficient . . . that the executing officers cannot reasonably presume it to be valid." *United States v.*

29

*Martin*, 297 F.3d 1308, 1313 (11th Cir. 2002) (quotation marks omitted).  None of these exceptions apply here.

Repackaging their probable-cause argument, Defendants contend that the wiretap affidavit and the resulting wiretap order were facially deficient because Agent Taylor's affidavit lacked fresh probable cause.  We have already rejected Defendants' staleness challenge on the merits.  Their contention that no reasonable officer could believe that probable cause supported the wiretap is less compelling still.

Defendants' only other argument is that the good-faith exception does not apply because they raised a *Franks* issue.  As discussed below, however, *Franks* is inapplicable because Defendants failed to make the required preliminary showing that Taylor's wiretap affidavit was deliberately or recklessly misleading.  Accordingly, Defendants have not shown that the district court erred in concluding that the wiretap evidence was admissible under the good-faith exception to the exclusionary rule, even assuming there was some deficiency in the necessity or probable cause showing.

### B.    *Franks* Hearing

Defendants challenge the validity of the wiretap orders issued in this case under the Supreme Court's decision in *Franks v. Delaware*, which requires an evidentiary hearing when a defendant makes a substantial preliminary showing that

statements or omissions made in an affidavit supporting a wiretap are deliberately false or made with reckless disregard for the truth. 438 U.S. 154, 155–56, 171–72 (1978); *United States v. Capers*, 708 F.3d 1286, 1296 n.6 (11th Cir. 2013) (explaining that *Franks* had been extended to affidavits submitted in support of a wiretap); *United States v. Kapordelis*, 569 F.3d 1291, 1309 (11th Cir. 2009) (applying *Franks* to information omitted from a warrant affidavit). To obtain a *Franks* hearing, a defendant must not only show that the affiant made false statements or omissions "intentionally or with reckless disregard for the truth," but also that the false statements or omissions were "necessary to the finding of probable cause." *Kapordelis*, 569 F.3d at 1309. Neither negligent mistakes nor immaterial omissions implicate *Franks*. *See Maxi*, 886 F.3d at 1331–32. If a wiretap order would be supported by probable cause even after setting aside the alleged misrepresentations or considering the information allegedly omitted, no hearing is required. *See United States v. Sarras*, 575 F.3d 1191, 1218 (11th Cir. 2009). We review a district court's denial of a *Franks* hearing for an abuse of discretion. *United States v. Barsoum*, 763 F.3d 1321, 1328 (11th Cir. 2014).

Defendants challenge the district court's refusal to conduct a *Franks* hearing to determine if Agent Taylor deliberately or recklessly omitted from his wiretap affidavit information concerning (1) the Government's access to information produced by Defendants in the LADP litigation pending in Los Angeles and (2) the

31

fact that Defendants had divested themselves of their interest in MCGI by November 2010. According to Defendants, the first category of information would have negated the Government's necessity showing and the second category of information would have undermined the Government's attempt to refresh probable cause based on a purported new manipulation of MCGI stock in March 2011.

As to the first category, Defendants have not pointed to any information uncovered in the LADP litigation that would have rendered a wiretap unnecessary in this case, which involved a different fraud scheme and a different corporate entity. The fact that the Los Angeles SEC office collected "voluminous" materials from Defendants in connection with the LADP litigation is irrelevant without some indication as to how those materials would shed light on the MCGI scheme that was the subject of the wiretap at issue here. As stated in Taylor's affidavit, the object of the MCGI investigation was to determine the scope of the MCGI conspiracy and all its participants. Defendants have not identified any materials generated in the LADP litigation that would have achieved this objective.

Further, Defendants failed to make a preliminary showing that Taylor possessed any of the LADP litigation materials when he submitted the June 24 affidavit. To the contrary, the district court found there was no "serious dispute" that the Government did not obtain the information from the LADP litigation until July 2015, well after the affidavit was filed. Defendants contend that the

32

Government *should have* tried to get the materials earlier, but at best that constitutes negligence, not deliberate or reckless conduct.

Nor did Defendants' decision to divest interest in MCGI in November 2010 negate the possibility that they were conspiring to manipulate MCGI stock in March 2011, given that their *modus operandi* was to manipulate stocks held in others' names. Defendants did not own a controlling share of MCGI stock in the months leading up to the March and May 2010 MCGI market manipulations, and acquiring control of the stock was one of the last steps necessary to accomplish the scheme.

In short, because Defendants did not make a substantial preliminary showing that Agent Taylor deliberately or recklessly omitted material information from his wiretap affidavit, the court did not abuse its discretion in denying their motions for a *Franks* hearing.

## C.    Material Variance

"The Fifth Amendment guarantees that a defendant can be convicted only of crimes charged in the indictment." *United States v. Holt*, 777 F.3d 1234, 1261 (11th Cir. 2015). This principle ensures that the defendant receives proper notice of the charges against him and has an opportunity to present a defense. *Id.* Accordingly, a material variance requiring reversal occurs "when the facts proved

at trial deviate[d] from the facts contained in the indictment" and the defendant suffered substantial prejudice as a result. *Id.* (quotation marks omitted).

Defendants argue that there was a material variance between the indictment's allegations concerning the Find.com scheme and the evidence the Government presented at trial to prove the scheme. Defendants note that the indictment alleged only three misrepresentations supporting the Find.com scheme, including statements related to share price, commissions, and the use of investment proceeds, but that the Government introduced evidence at trial about misrepresentations related to the technology possessed by Find.com, Cynthia White's role in the company, and the description of Scientigo, a shareholder in the company. We review *de novo* whether a material variance warranting relief occurred. *See United States v. Lander*, 668 F.3d 1289, 1295–96 (11th Cir. 2012).

Here, Defendants have not established a material variance, much less that any deviation between the facts alleged in the indictment and those proved at trial warrants reversal. For starters, the specific allegations in the indictment encompass many of the misrepresentations that Defendants contend created a material variance. The indictment repeatedly alleged that Defendants defrauded Find.com investors "by means of materially false and fraudulent pretenses, representations, and promises," including by making misleading statements about "the way in which" investment proceeds "would be used." Statements falsely

34

suggesting that Find.com would devote resources to procuring or developing certain technologies—which, based on the testimony presented at trial, were never in the pipeline at Find.com—fall squarely within the scope of this allegation, as they are misrepresentations concerning the use of investment proceeds.

Moreover, the technology, White, and Scientigo misrepresentations were consistent with the general Find.com scheme alleged in the indictment. A fatal variance exists only "where the evidence at trial proves facts *different* from those alleged in the indictment, as opposed to facts which, although not specifically mentioned in the indictment, are entirely consistent with its allegations." *United States v. Champion*, 813 F.2d 1154, 1168 (11th Cir. 1987) (emphasis in original) (quotation marks omitted). Here, the scheme as described in the indictment was exemplified by, but not strictly limited to, misrepresentations involving share prices, commissions, and use of proceeds. That the evidence at trial proved additional misrepresentations consistent with the exemplary categories of misrepresentations charged in the indictment did not cause a material variance. *Compare id.* (holding that, where the defendants were charged with conspiracy to import multiple loads of marijuana, consistent trial evidence regarding additional "uncharged loads during the time period of the indicted conspiracy" did not cause a material variance), *with Lander*, 668 F.3d at 1296 (finding a material variance where the central misrepresentation alleged in the indictment was specifically

35

disproved at trial, prompting the government to shift its trial strategy and rely on a different misrepresentation).

Finally, even assuming a variance occurred, Defendants have not shown substantial prejudice.  To assess prejudice, we consider "whether the proof at trial differed so greatly from the charges that [the defendant] was unfairly surprised and was unable to prepare an adequate defense."  *See Lander*, 668 F.3d at 1295 (quotation marks omitted).  Here, Defendants could not have been surprised by the Government's reliance on misleading statements about Find.com technology, Cynthia White, and Scientigo because those misrepresentations were contained within one of the two written offering documents identified by the indictment as the core of the Find.com scheme.  By identifying these documents and describing in detail how they were used to defraud Find.com investors, the indictment gave Defendants adequate notice to prepare a defense.  Accordingly, any variance did not cause Defendants prejudice warranting relief.

### D.    Prosecutorial Misconduct

Defendant Bercoon argues that the Government engaged in prosecutorial misconduct during its closing argument.  Bercoon did not object to the prosecutor's closing remarks at trial.  We therefore review his claim of prosecutorial misconduct for plain error.  *United States v. Frank*, 599 F.3d 1221, 1238 (11th Cir. 2010).  Under the plain error standard, we will only reverse a conviction if (1) an

error occurred, (2) the error was plain or obvious, (3) the error affected the substantial rights of the defendant, and (4) a "miscarriage of justice would otherwise result." *Id.* (quotation marks omitted). Bercoon has not satisfied these requirements.

To establish prosecutorial misconduct based on closing remarks, a defendant must show that the remarks were both improper and prejudicial to the defendant's substantial rights. *Id.* at 1237. A prosecutor's closing remarks can be improper if they materially misstate the facts shown by the evidence. *See United States v. Hands*, 184 F.3d 1322, 1333 (11th Cir. 1999) ("It is a fundamental tenet of the law that attorneys may not make material misstatements of fact in summation." (quotation marks omitted)). Determining whether a defendant suffered prejudice requires the court to consider the closing remarks "in the context of the trial as a whole and assess their probable impact on the jury." *Frank*, 599 F.3d at 1237 (quotation marks omitted). "A defendant's substantial rights are prejudicially affected when a reasonable probability arises that, but for the remarks, the outcome of the trial would have been different." *United States v. Reeves*, 742 F.3d 487, 505 (11th Cir. 2014) (quotation marks omitted).

Here, Bercoon argues that the prosecutor acted improperly by suggesting in closing remarks that the jury could infer his intent to commit fraud from the fact that, rather than contacting law enforcement, he had pursued another pump-and-

37

dump scheme with Veugeler the day after learning that the FBI was investigating Defendants for market manipulations. The prosecutor pointed out that Bercoon's conduct contrasted with that of Rosenberg and Weiner, who had contacted law enforcement as soon as they became aware of the fraud. Bercoon argues that the prosecutor's characterization of the evidence was inaccurate, as he had contacted the FBI, hired an attorney, and eventually began cooperating with the Government after the FBI visited Goldstein.

Contrary to Bercoon's suggestion, the prosecutor's closing remarks were not false or misleading. Unlike Rosenberg and Weiner, who contacted law enforcement when they learned that the MCGI trading activity was fraudulent, Bercoon did not immediately and proactively contact law enforcement after being advised that the FBI was investigating the MCGI market manipulation scheme. Instead, the wiretap evidence showed that Bercoon continued to conspire with Goldstein and to plan other market manipulations with Veugeler as late as August 2011. Further, three of the four remarks Bercoon challenges were made during the prosecutor's rebuttal to Bercoon's argument that Weiner was the bad guy "in charge" of the operation, while Defendants were merely well-intentioned businessmen. Contrasting Bercoon's conduct with that of Weiner was a fair rebuttal to this argument. *See Reeves*, 742 F.3d at 505 (noting that "issues raised

by a defendant in closing argument are fair game for the prosecution on rebuttal"
(quotation marks omitted)).

Even assuming the prosecutor's closing remarks were improper, Bercoon
has not shown that his rights were substantially prejudiced, much less that a
"miscarriage of justice" would result if his conviction stands. The district court
instructed the jury that it should only consider the evidence admitted in the case
and that "anything the lawyers say is not evidence," thereby curing any potential
prejudice. *United States v. Bobal*, 981 F.3d 971, 976 (11th Cir. 2020) (holding
that, even if the prosecutor's statements in closing were improper, the court "cured
the problem" by "instruct[ing] the jury that the lawyers' statements were not
evidence"). Moreover, given the overwhelming evidence of Bercoon's guilt, the
prosecutor's closing remarks, viewed in context, did not "undermine the
fundamental fairness of the trial" or constitute "a miscarriage of justice." *United
States v. Mueller*, 74 F.3d 1152, 1157 (11th Cir. 1996) (quotation marks omitted);
*see Reeves*, 742 F.3d at 505–06 (holding that "the strength of the competent proof
establishing the guilt of the defendant" weighed against concluding that improper
closing remarks substantially prejudiced the defendant).

**E.    Statements to the SEC**

Goldstein challenges the district court's denial of his motion to suppress
statements he made to SEC attorney Brunson during a preliminary, informal

39

telephone interview in June 2011, when Brunson was beginning her investigation into the 2010 MCGI market manipulations.  Those statements—that Goldstein had not received compensation or shares from MCGI and did not know whether co-conspirator Veugeler was associated with MCGI—were shown to be false at trial.  According to Goldstein, Brunson's promise of confidentiality rendered his statements involuntary.  The magistrate judge rejected this argument, as did the district court.  In reviewing a denial of a suppression motion, the district court's ultimate determination that the defendant's statements were voluntary is subject to *de novo* review, but we review the court's underlying findings of fact only for clear error.  *United States v. Farley*, 607 F.3d 1294, 1325–26 (11th Cir. 2010).  We discern no error here.

The magistrate judge held a hearing on Goldstein's motion to suppress, during which Brunson testified that she had no recollection of the telephone conversation with Goldstein, but that her file contained notes recording the substance of Goldstein's answers to her questions and a copy of a follow-up letter she sent to Goldstein after they spoke.  The letter stated, "As I explained, this inquiry is nonpublic and confidential."  Enclosed with the letter is a copy of the SEC's Form 1662, which explained in detail (1) a witness's rights during an SEC interview, including the right to have an attorney and the right to refuse to speak

and (2) how the SEC typically uses witness interviews, including sharing the information with law enforcement and other agencies where appropriate.

Brunson testified at the suppression hearing that, although she did not have a specific recollection of the conversation with Goldstein, her practice was to read the SEC's "Privacy Act script" at the beginning of every informal interview she conducted with a witness. The script informed the witness that (1) the interview relates to the investigation of a potential securities violation, (2) the witness has the right to have an attorney present while speaking to the SEC, (3) the witness has the right to refuse to speak with the SEC, but is subject to criminal penalties if he provides false information, and (4) the SEC routinely shares information obtained from witnesses with other authorities for investigation and enforcement purposes. Crediting Brunson's testimony, the magistrate judge found that, prior to interviewing Goldstein, Brunson had advised him of his basic rights and how his statements could be shared and otherwise used by the SEC. As such, the magistrate judge concluded that Goldstein's statements were voluntary. The district court adopted that ruling.

The court did not err, clearly or otherwise. Goldstein relies on Brunson's purported instruction before the interview that her inquiry was "nonpublic and confidential," arguing that this instruction led him to falsely believe he could speak freely to Brunson without fearing self-incrimination. But this argument is

untenable, given the magistrate judge's finding that Brunson also read the Privacy Act script to Goldstein. Crediting Brunson's testimony, the magistrate judge reasonably found that, as per her ordinary practice, Brunson had followed the script, warning Goldstein before the interview that any information Goldstein provided could be shared with law enforcement and other agencies for investigation and enforcement purposes. That factual finding, which was not clearly erroneous, establishes that Brunson did not coerce Goldstein's statements by deceptively promising to keep his statements confidential.

In a last-ditch effort, Goldstein challenges the magistrate judge's finding that Brunson read the Privacy Act script based on an alleged inconsistency between Brunson's testimony at the suppression hearing and at trial. According to Goldstein, Brunson testified at the suppression hearing that she typically read the script "word for word," but she acknowledged during trial that SEC practice was to "hit the high notes" of the script, including the witness's rights and the routine uses of information gathered during an interview. To the extent there is any inconsistency here, however, it is immaterial. On both occasions, Brunson testified that she "always" told witnesses the four most essential aspects of the Privacy Act script, including the fact that she "might share this information with other agencies."

In short, because Brunson specifically warned Goldstein that information gathered during an informal witness interview could be shared with other government agencies, Goldstein has not shown that deceptive promises regarding confidentiality rendered his statements involuntarily. Accordingly, the court did not err in denying Goldstein's motion to suppress his statements to Brunson.

### F.    Merged Civil and Criminal Investigations

Next, Goldstein challenges the district court's denial of his request for an evidentiary hearing to determine whether the SEC's civil investigation and the U.S. Attorney's criminal investigations improperly merged, depriving him of his due process rights. We review this issue for an abuse of discretion. *See United States v. Arbolaez*, 450 F.3d 1283, 1293 (11th Cir. 2006) ("Generally, a court's decision about whether to hold an evidentiary hearing lies within that court's sound discretion and will be reviewed only for an abuse of discretion."). Here, the district court did not abuse its discretion.

Goldstein's allegation that the SEC's civil investigation unfairly merged with the U.S. Attorney's criminal investigation is based on two facts: (1) that the SEC and FBI jointly interviewed cooperating witnesses and (2) that the agencies conducted their investigations at roughly the same time and shared information. Those facts are typical of parallel governmental investigations, which are common and generally proper. *See United States v. Edwards*, 526 F.3d 747, 759 (11th Cir.

43

2008).  Indeed, the SEC is statutorily authorized to share information with the U.S. Attorney's Office.  *Id.* (citing 15 U.S.C. §§ 77t(b), 78u(d)(1)).[7]

A due process problem might arise in the context of parallel investigations if the two government arms collude in bad faith to deprive the defendant of his constitutional rights.  *See id.*; *see also United States v. Stringer*, 535 F.3d 929, 940 (9th Cir. 2008) (collecting cases recognizing that dual investigations can implicate due process limitations).  Such bad faith collusion generally involves "affirmative misrepresentations" or "trickery or deceit" by the investigating authority to get the defendant to voluntarily turn over documentary or physical evidence relevant to the criminal investigation.  *See Stringer*, 535 F.3d at 940.  But Goldstein's allegation that the investigations overlapped failed to establish even a *prima facie* case of misconduct by either the civil or the criminal arm of the investigation against him. As such, the district court did not abuse its discretion in denying his request for an evidentiary hearing challenging the legitimacy of the investigations.

## G. Forfeiture

Defendants argue that the district court's $1,953,974 forfeiture order improperly held them jointly and severally liable, in violation of the Supreme Court's decision in *Honeycutt v. United States*, 137 S. Ct. 1626, 1632 (2017).  In

---

[7]  Goldstein also argues that SEC attorney Brunson induced him to make incriminating statements by promising to keep what he said confidential.  As discussed above, however, the district court did not clearly err in finding that Brunson expressly warned Goldstein that his statements could be shared with other government agencies.

reviewing forfeiture orders, we review findings of fact for clear error and legal conclusions *de novo*.  *United States v. Waked Hatum*, 969 F.3d 1156, 1161–62 (11th Cir. 2020).

In *Honeycutt*, the Supreme Court held that the language and structure of 21 U.S.C. § 853, a statute mandating forfeiture of proceeds obtained from certain drug crimes, limited forfeiture to "property the defendant himself actually acquired as a result of the crime."  *Honeycutt*, 137 S. Ct. at 1630, 1635.  Thus, when a court orders forfeiture under § 853, it may not hold a defendant "jointly and severally liable for property that his co-conspirator derived from the crime but that the defendant himself did not acquire."  *Id.*

Here, we need not decide whether *Honeycutt*'s reasoning applies to the forfeiture statute at issue here, 18 U.S.C. § 981(a)(1)(C), because even assuming it does, Defendants have not shown that the district court erred in imposing joint and several liability.[8]  As an initial matter, Defendants' argument that *Honeycutt per se*

---

[8]  We have held that *Honeycutt*'s reasoning applies to 18 U.S.C. § 982(a)(7), a forfeiture statute for healthcare fraud, *United States v. Elbeblawy*, 899 F.3d 925, 941–42 (11th Cir. 2018), *cert. denied*, 139 S. Ct. 1322 (2019), but have expressed doubt that it equally applies to 18 U.S.C. § 981(a)(1)(C).  *See United States v. Cingari*, 952 F.3d 1301, 1305–06 (11th Cir. 2020) (holding that *Honeycutt* did not establish that imposing joint and several liability under 18 U.S.C. § 981(a)(1)(C) was plain error because "*Honeycutt* was highly dependent on language found in 21 U.S.C. § 853 but absent from 18 U.S.C. § 981" (quotation marks omitted)), *cert. denied*, No. 20-5937 (U.S. Nov. 9, 2020); *see also United States v. Stein*, 964 F.3d 1313, 1325 (11th Cir. 2020) (holding that, because the statutory language of 21 U.S.C. § 853 and 18 U.S.C. § 981(a)(1)(C) differed, *Honeycutt* did not justify applying the intervening-change-in-law exception to the law-of-the-case doctrine); *cf. United States v. Waked Hatum*, 969 F.3d 1156, 1165 (11th Cir. 2020) (holding that, due to differences in statutory language, *Honeycutt*'s

prohibits ordering joint and several forfeiture has no basis in the Supreme Court's decision. *Honeycutt* did not purport to address joint and several forfeiture generally but instead narrowly addressed whether a defendant could be ordered to forfeit property that his co-conspirator alone acquired. *Id.* That scenario does not describe this case, which involved jointly acquired property. Here, the district court found that, as a result of the MCGI and Find.com schemes, $1,953,974 in fraud proceeds were deposited into bank accounts that "both Defendants had access [to] and [the] ability to control" and that were therefore "under the Defendants' joint control." Based on this finding, which Defendants do not challenge on appeal, the court reasonably determined in accordance with *Honeycutt* that each defendant personally acquired the total amount of the fraud proceeds deposited into their jointly controlled accounts. *See United States v. Cingari*, 952 F.3d 1301, 1306 (11th Cir. 2020) (holding that the defendants had "failed to establish that they did not mutually obtain, possess, and benefit from their criminal proceeds" where "no evidence show[ed] that the married couple split their co-earned criminal proceeds").

Further, consistent with *Honeycutt*, the district court limited the forfeiture to the total amount of proceeds Defendants personally acquired, ordering that the

---

requirement that forfeiture under 21 U.S.C. § 853 be limited to "tainted property" did not apply to forfeiture under 18 U.S.C. § 982(a)(1)).

46

Government may not receive more than a total of $1,953,974 in funds from Defendants. *See Honeycutt*, 137 S. Ct. at 1635. Thus, to the extent that *Honeycutt* applies to forfeiture under 18 U.S.C. § 981(a)(1)(C), Defendants have not shown that the district court ran afoul of the Supreme Court's holding by imposing joint and several liability.

## H.    Bercoon's Motion to Dismiss Indictment

Finally, Defendant Bercoon has filed a *pro se* motion to dismiss his indictment, alleging prosecutorial misconduct based on what he characterizes as numerous instances of Agent Cromer allegedly offering "perjured, false, and improper opinion testimony" before the grand jury. After thoroughly reviewing Bercoon's motion and the grand jury transcript, we find no merit in Bercoon's arguments. "[D]ismissal of an indictment for prosecutorial misconduct is an extreme sanction which should be infrequently utilized." *United States v. Jordan*, 316 F.3d 1215, 1249 n.68 (11th Cir. 2003) (quotation marks omitted). Where, as here, a defendant seeks to dismiss his indictment for the first time on appeal, we review only for plain error. *United States v. Vallejo*, 297 F.3d 1154, 1164–65 (11th Cir. 2002). Further, "[w]hen the alleged prosecutorial misconduct occurs in the context of a grand jury proceeding, we dismiss the indictment only when the misconduct 'substantially influenced the grand jury's decision to indict' or when there is 'grave doubt that the decision to indict was free from the substantial

47

influence of such violations.'" *United States v. Cavallo*, 790 F.3d 1202, 1219–20 (11th Cir. 2015) (quoting *Bank of Nova Scotia v. United States*, 487 U.S. 250, 256 (1988)).

Here, many of Bercoon's arguments rely upon an unfair reading of the grand jury transcript. *See id.* at 1220 (holding that the defendants had not shown that an agent intentionally lied before the grand jury because the defendants' interpretation of the agent's testimony was not "a fair reading" in context). For example, Bercoon contends that the prosecutor must have known that Weiner's story was false based on evidence contradicting aspects of his account, and thus that Agent Cromer testified falsely when he related to the grand jury what Weiner had told law enforcement. But Bercoon ignores the fact that the prosecutor elicited testimony from Cromer about parts of Weiner's testimony "that sound not quite right," highlighting certain inconsistencies in Weiner's description of the scheme. Similarly, Bercoon's argument that Cromer falsely testified that he had personally observed Goldstein trading out of one of Rosenberg's accounts unfairly reads Cromer's response to a compound question, which, given the context, any reasonable person would interpret as a statement about what Weiner had seen.

Other arguments that Bercoon makes lack any legal basis that could support a finding of plain error. For example, Bercoon cites no authority suggesting that the prosecutor acted improperly when, after numerous interruptions, she requested

48

that jurors hold questions until the end to facilitate the presentation of evidence. Notably, the request was not unreasonable under the circumstances, and, as Bercoon acknowledges, the prosecutor later solicited and received juror questions. Further, the "opinion" testimony that Bercoon challenges was clearly not prejudicial in context. For example, despite acknowledging that MCGI "was known to be a start-up," Bercoon argues that Cromer testified improperly when, in response to a grand juror's question about whether MCGI was a real company, he opined that it was never a fully functional business. Even assuming this statement constituted improper opinion testimony, the prosecutor elicited foundational testimony about MCGI's limited business dealings that fully supported Cromer's generalization, rendering it harmless. Bercoon also focuses on Cromer's allegedly false testimony that the Levys had already been convicted for "participating in numerous stock manipulations over many years, including the activities related to this MedCareers' stock." But even assuming Bercoon is right that the Levys were not convicted for manipulating MCGI stock in particular, this incidental comment was harmless. Cromer's testimony was not part of the Government's affirmative case and was instead prompted by a juror question about who the Levys were and why Weiner and Goldstein had met with them. Further, Cromer couched his response in uncertainty, stating "I'm not sure exactly," which provided the grand jury with enough information to weigh Cromer's stated belief about the Levys. *Cf.*

*United States v. Garate-Vergara*, 942 F.2d 1543, 1550 (11th Cir. 1991), *amended sub nom. United States v. Lastra*, 991 F.2d 662 (11th Cir. 1993) (holding that an agent's false statement to a grand jury that "Coast Guard officers saw crew members throwing bags overboard" was "neither intentionally false nor sufficiently prejudicial to warrant dismissal of the indictment," where the agent had "incorrectly assumed that [the Coast Guard] had seen the act of disposal rather than deduced it from the location of the bags in the water").

In short, the transcript reveals that the grand jury proceeding was a miniature version of the real trial, with Agent Cromer presenting the core evidence that the Government ultimately offered at trial. We discern no misconduct by the Government at either proceeding. Moreover, given the overwhelming evidence presented against Defendants both during the grand jury proceedings and at trial—including, among other things, Weiner's and Rosenberg's detailed description of the scheme, the wiretap recordings, the SEC's analyses of MCGI trading activity, and the financial analysis of bank accounts under Defendants' control—we are convinced that the grand jury's decision to indict was not substantially influenced by any improper testimony. *See United States v. Jennings*, 991 F.2d 725, 729 (11th Cir. 1993) (holding that a grand juror's friendship with one of the victims was harmless because "[t]he government presented overwhelming evidence to the grand jury for it to find probable cause to believe that [the defendant] committed

50

the offenses"); *see also United States v. Flanders*, 752 F.3d 1317, 1333 (11th Cir. 2014) (holding that, where a false allegation allegedly made before the grand jury was not repeated to the petit jury, any misconduct was harmless because "the petit jury's guilty verdicts demonstrate that there was probable cause to charge Defendants with the offenses for which they were convicted"). Accordingly, we find no basis to dismiss the indictment, and we deny Bercoon's motion to that effect.

## III.    CONCLUSION

Because Defendants have identified no error warranting reversal, we affirm Defendants' convictions and the district court's forfeiture order.

**AFFIRMED.**